IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

September 26, 2018 Session

**STATE OF TENNESSEE v. JENELLE LEIGH POTTER**

**Appeal from the Criminal Court for Washington County**
**No. 39553B, 41831  Jon Kerry Blackwood, Senior Judge**

_____

**No. E2015-02261-CCA-R3-CD**
_____

A Washington County jury convicted the Defendant, Jenelle Leigh Potter, of two counts of first degree premeditated murder and one count of conspiracy to commit first degree murder. The trial court merged the conspiracy conviction and ordered concurrent life sentences for both murder convictions. On appeal, the Defendant asserts that: (1) the trial court erred when it failed to grant her request for a change of venire; (2) the evidence is insufficient to support her convictions for premeditated first degree murder and conspiracy to commit premeditated first degree murder; (3) the criminal responsibility statute, Tennessee Code Annotated, section, 39-11-402, is unconstitutionally vague; and (4) the trial court erred when it failed to enjoin the prosecutor from publishing his book about this case until after the final adjudication of this case. Following our review, we affirm the convictions for first degree premeditated murder, but hold that merger of the conspiracy conviction was error. We reinstate the Defendant's conviction for conspiracy to commit first degree murder and remand to the trial court for sentencing on that count.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Cameron L. Hyder, Elizabethton, Tennessee, for the appellant, Jenelle Leigh Potter.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Ken C. Baldwin,  District Attorney General; and Dennis Brooks and Matthew Roark, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case involves the murders of two victims, Billy Payne ("Victim Payne") and Billie Jean Hayworth ("Victim Hayworth"), whose bodies were found inside their Mountain City home ("Paw Bill's residence")[1] in January 2012. For these crimes, a Johnson County grand jury indicted the Defendant's father, Marvin E. "Buddy" Potter, Jr., ("Buddy"), the Defendant's mother, Barbara Potter ("Barbara"), the Defendant, and Jamie Curd ("Jamie").[2] Buddy was tried and convicted in October 2013;[3] Jamie entered a plea agreement with the State;[4] and Barbara and the Defendant were tried jointly in May 2015. The following is a summary of the evidence presented at trial.

On Tuesday morning, January 31, 2012, Brad Osborne drove to "Paw Bill's" residence at around 6:30 a.m. to pick up Victim Payne for work. When Mr. Osborne arrived, Victim Payne's father, "Paw Bill," had already left for work. Mr. Osborne waited a few minutes, noting that the victims' shared bedroom light was illuminated. When Victim Payne did not exit his house within a few minutes as he normally did, Mr. Osborne exited his vehicle and walked around the side of the house to the rear sliding glass door that was "seldom" locked. Mr. Osborne knocked on the sliding glass door and then entered the residence. Inside, he heard an alarm clock ringing that continued ringing throughout the time Mr. Osborne was inside the residence. From the living room, Mr. Osborne called out to Victim Payne numerous times with no response. He used the house landline to call Victim Payne's cell phone and did not hear Victim Payne's cell phone ringing inside the house. As Mr. Osborne turned to leave, he again called out to Victim Payne. Upon receiving no response, Mr. Osborne left the house and drove to work alone.

Later that morning, at around 10:00 a.m., Roy Stephens, a former neighbor, went to Paw Bill's residence to pick up his mail. Mr. Stephens noticed that Victim Payne's and Victim Hayworth's vehicles were at the residence, so he knocked on and then entered the unlocked sliding glass door at the back of the home. When he entered the residence, Mr. Stephens "holler[ed]" but received no response. He continued to call out as he walked down the hallway toward the bedrooms, and when he looked into the first bedroom, he saw blood near the doorway and found Victim Payne lying on his back on the bed. He "hollered at [Victim Payne][,] approached him, and grabbed him by the arms to see if he would respond[.]" When Victim Payne did not respond, Mr. Stephens ran out

---

[1] The victims lived with Victim Payne's father, "Paw Bill."

[2] Due to the shared surname of three of the defendants in this case, we refer to all four defendants charged with these offenses by their first name. We mean no disrespect but do so for the sake of clarity.

[3] Buddy was convicted of two counts of first degree premeditated murder and sentenced to serve two consecutive life sentences.

[4] Jamie pleaded guilty to two counts of facilitation of first degree murder and received concurrent twenty-five year sentences.

of the house and told his wife, Linda Stephens, who was sitting in their car, to call 911 because Victim Payne was dead.

Mrs. Stephens, who was trained in CPR, entered the residence to attempt to provide aid. She found Victim Payne "very stiff and ice cold[,]" and his face looked as if he had been beaten. When she attempted to find a pulse in Victim Payne's neck, Mrs. Stephens realized that his throat had been cut. Mrs. Stephens used a phone in the living room to call 911. While she was speaking with the 911 operator, Mr. Stephens heard a noise coming from a second bedroom. When he entered the room, he found Victim Hayworth lying on the floor of the second bedroom with the victims' seven-month-old baby in her arms. Mr. Stephens noticed that the baby was breathing and appeared to be asleep. However, Victim Hayworth was not breathing, and Mr. Stephens could "see a hole in her head."

As part of the investigation into the victims' deaths, an autopsy of both victims was conducted, and the autopsy report was consistent with the Stephens' observations at the crime scene. The medical examiner who performed the autopsy on Victim Payne found a visible gunshot wound under his left eye. Victim Payne also suffered deep "slash wounds" to his neck. The medical examiner concluded that Victim Payne's cause of death was a "[g]unshot wound of the head and sharp force injuries of the neck" and that the manner of death was homicide. Victim Hayworth also sustained a gunshot wound to the head. The medical examiner opined that Victim Hayworth's cause of death was a gunshot wound to the head and that the manner of death was homicide.

Johnson County Chief Deputy Joe Woodard and Tennessee Bureau of Investigation ("TBI") Special Agent Scott Lott were assigned the investigation in this case. During the investigation, many of the victims' friends and family members identified the Potter family as "enemies" of the victims. As they spoke with various individuals, law enforcement officers began to see a connection between social media and the development of hostility between the victims and the Potters that escalated over the months leading up to the murders.

Buddy and Barbara moved from Pennsylvania to Mountain City in 2004. Christie Groover, Buddy and Barbara's oldest daughter, recalled that Buddy joined the Marines at eighteen, and she had been told that he worked for the CIA during the Vietnam War. Around the time of Ms. Groover's birth, Buddy was injured while "building the high tension electric poles" and was no longer able to work or remain in the Marines. Ms. Groover recalled days during her childhood when Buddy would be unable to get out of a chair. In addition to his back injuries, Buddy also suffered from pulmonary issues. Ms.

Groover last saw Buddy in July 2010, and she described him as "feeble" and walking with the support of a cane.

Buddy and Barbara raised their only children, Ms. Groover and the Defendant, in Pennsylvania. The Defendant graduated from high school and could read and write but had some difficulty with learning. About the Defendant's ability to learn, Ms. Groover stated:

> She was diagnosed when she was younger with learning disabilities. She couldn't hear till she was maybe 2 or 3, I guess. I'm – I'm not really sure of the age. She was in speech therapy, had tubes put in her ears, had to have her tonsils out, all that kind of stuff to try to help her hear better. She was sick a lot. She had what they said were learning disabilities. She was in Special Education, I think through most of her school career.

Ms. Groover agreed that the Defendant was "a little bit slower in learning and in developmental capacity" and that the Defendant's reasoning and interaction with other people had always been "a little odd."

Ms. Groover believed that Barbara and Buddy "coddled" the Defendant. As the older sibling, Ms. Groover never felt she needed to protect the Defendant because her parents always took care of any issues the Defendant faced. Ms. Groover said that she did not believe that the Defendant's disabilities were "as bad as everybody else said they were." She had witnessed the Defendant manipulate and deceive others and, therefore, knew what the Defendant was "capable of." In an interview with the TBI, Ms. Groover identified "Cody," "Matt" and "Chris" as "alternative personalities" of the Defendant.

Victim Payne's sister, Tracy Greenwell, met the Defendant at a grocery store and the two began speaking often by phone. In 2009, the Defendant, who turned twenty-eight that year, became a friend of Victim Payne through Ms. Greenwell when Ms. Greenwell began inviting the Defendant to accompany her on various outings, such as rock climbing and a party at Paw Bill's residence. Before the Defendant was allowed to go anywhere with Ms. Greenwell, however, Ms. Greenwell had to go to the Potter residence "a couple of times" so that Barbara and Buddy could get to know her.

In 2010, negative comments about Victim Payne and Victim Hayworth began appearing on the Mountain City page of the website "Topix." The Topix website allowed a person to post on the site using any name, so although the derogatory posts were made by various users such as "Matt Potter," Ms. Greenwell and Victim Payne believed that the Defendant was the author of the derogatory posts. The State submitted several portions of Topix postings related to this case. A "Matt Potter," whom the Defendant

identified on her Facebook page as her "brother," wrote the initial post, calling Victim Hayworth and two of her friends, Lindsey Thomas and Tara Osborne, "no good whores" and accusing the women of selling drugs. He then made numerous threats of violence. A "Kelly" responded in support of "Matt's" accusations and threats, adding that Ms. Thomas had HIV and offering support of the Defendant. "Matt Potter" posted again demanding Ms. Thomas stop harassing the Defendant and issuing threats of violence in retaliation. The postings regarding the victims and Ms. Thomas continued as follows:

Thursday Apr 21

Dan White AOL: Wow Matt and Kelly. I new she was bad but I had no clue she was off on the deepend. She is crazy that's for sure. Sounds like all of them are. I know [Victim Hayworth] that B**ch has lived with more guys and have sex with 80% of Mtn City and [Ms. Thomas] i would say Half of Mtn city Then you Trade and Butler and then you have Doe and then Johnson City and then Kings port she has been all over and she does have HIV this is all around town. and [Ms. Osborne] she will give it to anyone her poor Husband he's a nice guy but he never wants to be home with her. I think when his baby is 18 he will leave her dumb a** too. She is a whore too . I agree with you both. and this girl [the Defendant] I do know as in Passing but she is a good girl and was brought up right you can tell everything is your welcome and Hello and thank you and she just a sweet girl. I will be praying for [the Defendant]. As far as the other ones go there no good whore sluts and that is carrying something and giving it to everyone. Damn girls. They live in high school still and they need to grow up.

. . . .

Thursday Apr 21

Matt Potter AOL: . . . [The Defendant] is a sweet person and ppl try to get her. But she has alot of us behind her if she know's us or not. But Her Dad is Big time and he will deal with the rest of this sh*t. There F**king whores

- 5 -

and thats all this town is and Drugs. I know for sure [Victim Hayworth] and [Ms. Thomas] did drugs together and i know [Ms. Thomas] does Meth she get's off Jason. I know w[a]y to much lol. I love that [the Defendant] is not like them she stayed sweet . . . . they are dumb a** holes. mother f**kers get what's comeing there way. and they dont know who i am.

Friday Apr 22

Matt Potter AOL:    Well i guess [Victim Payne] dont know that have his Number and his phone is being taped. Ha i know what he said about [the Defendant] and it was wrong. He's a f**king work when these's girls are doing this to [the Defendant] we got our stuff and [the Defendant] I'm sure has stuff too. I'm going to be posting numbers if they dont stop buging [the Defendant]. And then all kind's of ppl will be calling them. I have cell's to home phone numbers. and f**king [Victim Hayworth] is geting so fat with that baby she looks like a chipmonk thats eating to many nuts LOL. I hope she lose's that baby in time. It dont need a mother like [Victim Hayworth] and [Victim Payne] he's no father by the way he acts and talks. Sooner thy move out of town the better. I think something about geting a house . I hope he cant get it. I hope they have to live out in the woods. More better for chipmonk, she cant make friends out there and f**k deer and bear and whatever else. I hope a bear would eat her but the way she looks it would go runing the other way LOL. Ugly a** B**ch whore. Cant leave no one alone. Drugie whore a** B**ch. Go f**k a damn tree for all i care. Leave [the Defendant] alone .

The general content of the subsequent Topix posts were strikingly similar, although the threats of violence escalated. A "Mike Dunn" posted:

"I'm about to fight with you [Victim Hayworth] why dont you shut up your fucking mo[u]th you B**ch. One day girl you are going to get beat up really good andleft for dead. You better sut up you b**ch. Go f**k a cow

- 6 -

for all i care. Damn hooker, slut bag whore …. And your Basterd baby take it with you and leave this f\*\*king town. You wont leave here alive."

"Matt Potter" posted a response that read, "Damn i think we just need to gut her and leave her for dead and kill the damn f\*\*king whore." He also issued a threat to Victim Hayworth writing, "[Y]ou're a f\*\*king no good person [and] your day is comeing."

Victim Payne would print out copies of the negative posts and place the copies into a three-ring binder. Victim Payne showed Ms. Greenwell some of the material he collected in his binder, prompting Ms. Greenwell to post the following message to the Defendant on Facebook in late November 2010, "[Y]our friend Matt needs to leave [Victim Hayworth] and [Ms. Thomas] off of the Topix website. You lost my brother [Victim Payne] as a friend and I'm not happy with you either." The Defendant responded to Ms. Greenwell's message by denying that she had posted negative comments about the victims. The Defendant claimed that she did not know who "Matt" was, that she had done nothing wrong, and that there had been "a lot of trash talking about [the Defendant] in town from both of [the victims] . . . ."

In the fall of 2010, one of Victim Hayworth's friends, Tara Osborne, met the Defendant in the check-out line at Food Country. The Defendant was talking to the cashier about a ring that her boyfriend had given her and she included Mrs. Osborne, who was in line to check-out, in the conversation. After this meeting, Mrs. Osborne received and accepted a friend request on Facebook from the Defendant. Mrs. Osborne, however, quickly grew tired of the "negativity" the Defendant created on Facebook and the frequency of the Defendant's "messaging" to her.

In September, Mrs. Osborne sent the Defendant a private message on Facebook, in which she apologized for not responding to the Defendant's instant messages and offered computer problems as an excuse for her lack of response. Mrs. Osborne received the following response from the Defendant's Facebook account:

> [H]ey, sweetie, it's really okay. I understand. I hope you all are doing well. I thank you for taking the time to write me. I hope you get it all worked out and everything. I'm not sad, or mad, or anything with you, honey. I can understand. It's okay. I'm doing okay. My health is not well and things I'm trying to fix and let people go and just leave me alone, but, I think that it is too much to ask for, laugh out loud. If they don't stop talking and putting me down I'm going to end up saying what I['m] really think[ing] and how mad . . . I really am and see how they like it. I have not

done anything to anyone and I s[t]ay to myself [and] talk to friends[.] [But] they go overboard and they [are] just [ ] mean girls, really. I hate they talk about me and I hate they act like they do - - anything to anyone to get away with it. It's sad. Well, anyways, I hope you are doing well. I'm praying and thinking of you all. Take care and God bless, [the Defendant].

After this, Mrs. Osborne continued receiving numerous instant messages from the Defendant. To try to alleviate the issue, Mrs. Osborne altered her Facebook page so that it did not indicate when she was on Facebook. When that did not resolve the issue, Mrs. Osborne removed the Defendant as a friend from her Facebook account because the Defendant talked badly about Victim Payne and Victim Hayworth "so much."

On February 6, 2011, Mrs. Osborne received a message from the Defendant's Facebook account, which read:

I'm not sure what I did, but I have not done anything. I'm not sure why you took me off your friends but I'd like to know why. We . . . have never had any issues.

Mrs. Osborne responded:

[H]ey, it's not anything that you have done. I'm making my Facebook close friends and family and did not see the point in having people as friends if I did not talk to them. Don't take it to heart, I don't mean anything by it.

Mrs. Osborne received the following response from the Defendant's Facebook account:

Oh, okay, that's fine, sweetie. I was making sure I did not think . . . I did anything wrong at all. I just did[n't] understand[.] [T]hat is great and fine and I can understand. Thank you for getting back to me. I took a lot [off] . . . mine, too. But, it was for the best. Thank you for getting back to me. You're so sweet. Take care, God bless, [the Defendant].

Mrs. Osborne was frustrated with the Defendant at the time these messages occurred because the Defendant "was talking about [her] friends"; however, Mrs. Osborne remained cordial in her writing because she hoped to "pacify" the Defendant, thereby allowing Mrs. Osborne to "move on." Following this interaction, Mrs. Osborne received another message from the Defendant through Facebook, accusing Mrs. Osborne of "harassment, the phone calls, [and] messing with [the Defendant's] mailbox." In response, Mrs. Osborne called the Defendant and denied all of her accusations. She

further told the Defendant the "truth" about why she had "defriended" her. Mrs. Osborne told the Defendant that she "was tired of [the Defendant's] drama and her bull crap that she was posting about everybody else knowing that it was not true." The Defendant "threw it back" on Ms. Osborne, telling her to "leave [her] alone," and claiming Mrs. Osborne was affecting her health.

Following this exchange, Mrs. Osborne received several more phone calls from or related to the Defendant. One such call, in March or April 2011, was from a male caller using a voice disguiser. The caller told Mrs. Osborne that she needed to leave the Defendant alone and stop "the harassment, the phone calls, the vandalism, [and] the stalking." Mrs. Osborne denied that she had participated in any of the conduct the caller accused her of and told the caller that she would be "taking this" to the sheriff's department. The following day, Mrs. Osborne went to the Johnson County Sheriff's Department and was directed to "Safe Haven," where she filed for an order of protection.[5]

Another friend of Victim Hayworth, Lyndsey Potter,[6] had a similar negative interaction with the Defendant on Facebook. Ms. Potter became Facebook friends with the Defendant in 2011. Initially, the Defendant would "like" or comment on Ms. Potter's "status updates" and pictures. However, at one point, the Defendant took a profile picture from either Victim Hayworth's or Victim Hayworth's best friend, Lindsey Thomas's Facebook account, posted it, and "said some nasty things" in reference to the photograph. In response, Ms. Potter commented on the posting, asking the Defendant to remove the post because it "was inappropriate." The Defendant complied and removed the post and did not initiate any contact with Ms. Potter until several months later, in the summer of 2011. The Defendant sent Ms. Potter a private message, which read as follows:

> I'm not trying to be mean, but your so called friends are still coming after me and I'm never alone, and they have done a lot to my house and to my family, and I'm not mean but I'm getting there. I put that pic of them on once for a few friends to see who they were and I took it down. Do I think they are mean? Yes. Do I think you are fooled? Yes. You need to be careful who you're friends with. Maybe it's not because I'm from here, but I'm sick of this crap and it needs to stop. They need to grow up and live their life like I'm living mine. I'm sick and in the hospital more than I'm at home and they need to stop. I hope you don't think I'm being mean, but

---

[5] The order was later dismissed, however, because of a lack of the statutorily-required relationship between the parties.

[6] Ms. Potter testified that she was not related to the Potter family charged in these offenses.

it's about time I take up for myself and say what I think for once. I've never done that, wow. I'm 30 and I act more grown up than most people. I have been through too much to let them get to me.

Ms. Potter responded to the message, stating:

Sorry that you're sick, but have you actually seen them doing this, or are you just assuming 'cause you want it to be them? I honestly don't believe that they're bothering you. They have much better things to do than to worry about you. [Victim Hayworth] just had a baby, so, why in the hell would she be so out to get you? I think the best thing for you to do is to drop it, keep your mouth shut and move on. If they are bothering you then they'll see it isn't working and they'll quit.

The Defendant then responded:

Hi, Lyndsey. No, I know what they are doing and I know other people that have seen it, too. But, I was not going to write you back, but what made me so mad is you think I want to be like them. Yes, a whore and living with guys and sleeping around and drinking and smoking, yeah, right. I love who I am and I have a good life. I'm 30 years old. They can't grow up and they don't even have jobs and they lie . . . and I am so not like that. I don't care that she had her baby. I feel bad for it, a mother like her. I hope maybe it can go to a better home, but the thing is like I say, I know . . . . who I am and I love who I am and I'm not from here and I'm smart. People down here never seem to do anything with their lives other than pick and, excuse me, hurt people. I'm not like that. I'm a nice girl and I'm doing the best I can. My health is no one's [ ] business, I guess. But, yes, it's . . . bad but I'm grateful for every day that God gives me, so, maybe you should think before you talk.

Ms. Potter replied:

You don't seem very smart to me, but that's my opinion and to each their own. No one is perfect and I'm positive you're definitely not. My advice to you really is to drop it. And you say you're 30 years old, this doesn't seem like a smart 30 year old behavior to me, smart one.

In a final message, The Defendant replied:

Well, I think they really need to stop their damn games. As far as me being smart it's kind of funny, I got 4.0 out of high school and I'm still smarter than you girls. I don't like you anymore. I thought you were nice, but you are not. And, wow, you're dumb for everything is right in front of you. Let me guess, you do drugs with them. Well, I will block you and I will never talk to you ever again. I think you are no good. Rich whores is what you three are and you need to get over yourselves.

There was no further communication between the two.

Victim Hayworth's best friend, Lindsey Thomas, also received a friend request on Facebook from the Defendant in 2011. Ms. Thomas had never met the Defendant but had seen her "out in town." Ms. Thomas accepted the friend request but quickly realized that the Defendant was posting negative comments about her and Victim Hayworth, calling the women "mean." At this point, Ms. Thomas had never spoken to the Defendant, so she was certain she had done nothing to warrant the accusation. The Defendant then began sending private messages to Ms. Thomas, asserting that Ms. Thomas and Victim Hayworth were "mean" and that the Defendant "wished" they would leave her alone.

Ms. Thomas called the Defendant and asked her "to please quit writing stuff" about Ms. Thomas. After this phone call, the Defendant began calling Ms. Thomas frequently. At first, it was a few phone calls, but soon it became fifteen to twenty times a day. During some of the phone calls, the Defendant would tell Ms. Thomas to leave her alone, but during others, the Defendant would just breathe into the phone and not speak. Ms. Thomas knew it was the Defendant because the Defendant's home phone number would be displayed on Ms. Thomas's cell phone. Ultimately, Ms. Thomas grew tired of the Defendant's Facebook postings and phone calls, and she filed a phone harassment charge against the Defendant in general sessions court.

While Ms. Thomas's phone harassment charge against the Defendant was still pending, Victim Hayworth gave birth to her and Victim Payne's son in July 2011. A few weeks after the baby's birth, Victim Hayworth was pumping gas at a convenience store when a vehicle came through the parking lot and stopped at the bumper of Victim Hayworth's car, blocking her car. Mrs. Stephens, who was inside the store working, saw two women with blonde hair in the vehicle. Mrs. Stephens saw that "[t]he driver of the vehicle's arms were flying as if they were screaming and the passenger [] was leaning over as if they were saying something . . . ." Mrs. Stephens could not identify the women in the vehicle or hear what they were saying to Victim Hayworth; however, she noticed that Victim Hayworth became visibly upset and distressed.

Mrs. Stephens opened the front door of the store and asked Victim Hayworth, "[A]re you okay?" Victim Hayworth, who was crying and "visibly shaken," responded, "No. No, I'm not." Mrs. Stephens offered to call the police and the two women in the vehicle left the parking lot and "went up the road" towards Mountain City. Mrs. Stephens then approached Victim Hayworth at the gas pumps. Victim Hayworth was "sobbing" so badly that she was spilling gasoline, so Mrs. Stephens took the nozzle to the gas pump from her. Mrs. Stephens asked what had happened, and Victim Hayworth identified the two women in the vehicle as Barbara and the Defendant. Victim Hayworth explained that Barbara and the Defendant told her that she did not deserve to be a mother and that she should not have been "given a child."

Ms. Thomas's phone harassment case against the Defendant was eventually tried in November 2011. Following the hearing, the general sessions judge dismissed the case against the Defendant.

Jamie first met the Defendant and her parents through his cousin Victim Payne in late 2009, when he accompanied Victim Payne to the Potters' residence to deliver some medication. A few days later, Jamie was with Victim Payne when the Defendant called Victim Payne and asked for Jamie's telephone number. Jamie provided the Defendant with his home phone number, and the Defendant began calling him in short thirty to forty-five-second phone calls. The Defendant explained that she could not speak longer because she did not want her parents to know that she was calling Jamie.

At one point, the Defendant told Jamie that her computer was "messing up[,]" so Jamie went to the Potter's residence and worked on their computer. He stated that he performed a disk clean-up of the computer and eventually reformatted it. Jamie explained that his work on the Potter's computer took several visits. At this time, he and the Defendant were "just friends[,]" and she would sit with him in the computer room and talk to him while he worked on the computer. Jamie testified that, although he occasionally "worked on people's computers[,]" he had no specialized computer training. He stated that his knowledge of computers was "self-taught," and he explained that he could "erase Windows and re-install it" by following the step-by-step instructions provided on the formatting disk. Jamie stated that he had an email account at sleepiingbear@yahoo.com but that he did not have a Facebook page.

Jamie eventually purchased the Defendant a prepaid cell phone so that he and the Defendant could talk without her parents' knowledge. The Defendant instructed Jamie to hide the cell phone in a bush at the corner of her front yard where she could retrieve it. The Defendant used the cell phone to call him until Barbara discovered the cell phone and sent Jamie a text message, letting him know that she had the phone. Jamie then purchased a second prepaid cell phone for the Defendant and again placed the phone

under the bush in the Defendant's front yard. Jamie testified that the phone number for the Defendant's cell phone was 423-707-4786 ("the Defendant's cell phone"), and he identified Exhibit 92 as a photograph of the Defendant's cell phone. Jamie stated that his cell phone number was 423-291-1415 ("Jamie's cell phone"). After secretly speaking for five or six months, Jamie and the Defendant began to talk about eloping together "in the future[.]"

On Jamie's birthday, he went to Paw Bill's residence, where he drank so much alcohol that he passed out. At around 8:30 a.m. the next morning, Jamie received a call from Buddy, who stated that "[The Defendant] had left the house and they found her in a ditch and that she didn't love [Jamie] and . . . [Buddy] told [him] to stay away from her." Buddy then put the Defendant on the phone, and she said she did not love Jamie. Jamie agreed to stop talking to the Defendant; however, she called him three days later to tell him that she loved him and wanted to keep talking to him.

Jamie and the Defendant spoke on the phone for hours, sometimes all night long, and the Defendant sent Jamie text messages "all the time." Because the Defendant said that she "didn't want her mother to know they were talking," the Defendant contacted Jamie at odd hours. The Defendant also told Jamie never to call her; she always initiated any phone calls. Although Jamie considered the Defendant his girlfriend, he could not take her out on a date because Barbara did not approve of him.

Jamie knew Victim Hayworth through his work at Parkdale Mills, a textile plant in Mountain City. After Victim Hayworth began working at the plant, she and Victim Payne began dating. Victim Payne told Jamie that he and Victim Hayworth "hit it right off, and that he . . . just fell head over [heels] in love with her." The couple quickly became serious, and Victim Hayworth moved in with Victim Payne and Paw Bill. Victim Hayworth then became pregnant with Victim Payne's child. The Defendant did not like Victim Hayworth and often said that Victim Hayworth did not "deserve that kid." The Defendant called Victim Payne "a drunk[.]" When Jamie told the Defendant that Victim Payne was in love with Victim Hayworth and that he believed the relationship would last, the Defendant would respond "in disgust." The Defendant was adamant that Victim Payne was "not going to keep [Victim Hayworth], that she was just another girlfriend that wouldn't last long."

Up until Victim Hayworth and Victim Payne began dating, the Defendant had been a friend of Victim Payne and Ms. Greenwell. The Defendant would use Jamie's cell phone to call Victim Payne while Jamie worked on the Potter computer. According to Jamie, "everybody" was friends and there were no conflicts; however, after Victim Hayworth moved in with Victim Payne, problems began to arise between the Potters and

the victims, and it was around this time that Jamie first began receiving text messages from "Chris."

The Defendant was the person who first told Jamie about "Chris." She said "Chris" was a friend of the family and "like a brother to her." The Defendant said that she and "Chris" were the same age and that he had lived next door to her in Pennsylvania. She said that, when she was in high school, "Chris" would take her to school and pick her up after track practice. The Defendant told Jamie that "Chris" worked for the CIA on "cases and stuff" and that "Chris" had a house in Tennessee and one in Pennsylvania, and he "would go back and forth."

The Defendant also spoke about "Chris" to friends online like Bob Meehan, who lived in Pennsylvania. Mr. Meehan never met the Defendant in person, but they interacted through text messages, emails, and Facebook, and he considered himself to be in a "long distance relationship" with her. During his conversations with the Defendant, she occasionally mentioned someone named "Chris," whom she said was a CIA agent from Pennsylvania who had transferred to Tennessee. The Defendant also communicated daily via text message with Melanie Clayton, another online friend who lived in North Carolina. The Defendant told Ms. Clayton about "a Chris or a Matt that she referred to as like a brother to her." The Defendant also told Ms. Clayton that she had a boyfriend, Jamie Curd, whom she said lived "down the road" and worked on computers.

The Defendant and "Chris" would both talk to Jamie about Victim Payne and Victim Hayworth. Jamie recalled that the Defendant would angrily complain about people posting negative comments about her on Topix, and "Chris" would also report to Jamie about the postings concerning the Defendant on Topix, saying that "it needed to stop." "Chris" introduced himself to Jamie as a "a friend of the Defendant's[,]" and he told Jamie that he worked for the CIA. "Chris" did not have an email account, so he would contact Jamie through text or by email sent to Jamie's cell phone from the Defendant's email address. Jamie never spoke to "Chris" on the phone or met him in person. "Chris" told Jamie that he had a "phobia of phones" and did not like using them. The Defendant told Jamie that "Chris" also communicated with her through email.

When Jamie would receive an email from the Defendant's email address from "Chris," he could identify "Chris" as the author based, in part, on the words used in the emails. The emails from "Chris" addressed Jamie in a manner that the Defendant did not. For example, "Chris" would begin emails with "hey, man, or hey, dude, how's it going[.]" According to Jamie, the Defendant never cursed, called people names, or spoke hatefully to people; however, "Chris" would "rant and rave about everything" in his emails. He cursed, called people names, and wished harm on others. "Chris" would also typically sign his emails as "Chris." Jamie recalled that "Chris's" hatred was directed at

- 14 -

Victim Payne, Victim Hayworth, and "anybody that was friends with [Victim Payne]." "Chris" also told Jamie how much the Defendant loved him, and he advised Jamie on how to better his relationship with the Defendant.

Barbara and Buddy eventually "warmed up" to Jamie after the death of his mother in May 2011. Buddy called Jamie and offered "condolences and told [Jamie] if [he] needed anything to give him a call." This was the first communication between the two men since Buddy had told Jamie to stay away from the Defendant the morning after Jamie's birthday. Barbara also called Jamie and invited him to dinner. Jamie was comforted by this gesture in the wake of the loss of his mother and felt that he had "somebody to talk to." Barbara then began inviting Jamie to the Potter's residence on holidays.

When Jamie would visit the Potter residence, the Defendant often talked about Ms. Thomas, whom she referred to as "[p]an face." Additionally, Barbara "would bring [Jamie] up to speed on who was emailing what, or . . . what all the bad things that they'd said about the Defendant. And that ["]Chris["], whom she referred to as her son, was angry and that . . . ["Chris"] was firing back with emails and it was like a war." During these conversations, Buddy would say that he did not understand "why they were doing it" and that he wanted it to stop. Jamie described Barbara as "worried," and she would ask the group, "[W]hat are we going to do[?]" The Defendant was present during these conversations but would remain silent. When she spoke to Jamie on the phone the Defendant was "opinionated" about things, but when she was around her parents, the Defendant acted "needy" like "a kid to a parent."

In the fall of 2011, Jamie gave the Defendant a ring during a trip to Boone, North Carolina with Jamie's niece, Lori Curd. Jamie was in love with the Defendant, but Barbara still did not know that he and the Defendant were in a relationship. Jamie felt "intimidated" by Barbara and "walk[ed] on eggshells" around her because he wanted her approval. During visits to the Potter residence, Barbara continued to relate to Jamie "what all was being said[,]" and Barbara warned Jamie that "[the victims were] trying to add him to the mix." However, "Chris" told Jamie, "I've got your back."

After the Defendant was charged with phone harassment, the Potters asked Jamie to go to court with them. Jamie initially declined, but eventually agreed to testify that the Defendant was ill and that, to his knowledge, she did not drive. After court on November 30, 2011, the Potters invited Jamie Curd to eat lunch at a convenience store located near Victim Payne's home. While they were eating, Victim Hayworth and Mrs. Osborne came into the store and then walked out. When the Potters and Jamie finished eating, Victim Payne pulled up in the parking lot. Victim Payne got out of his car and began

- 15 -

angrily "hollering" at the Potters. Victim Payne and Buddy exchanged "a few words," and they "holler[ed] and yell[ed]" at one another while Jamie quickly left the scene.

After the confrontation between Victim Payne and the Potters, Victim Payne called Jamie. Victim Payne was upset and told Jamie that he had a folder "about two inches thick of emails and stuff that he'd printed off the internet [] saying how he was a bad dad and how he didn't deserve his children and . . . he said it hurt." Victim Payne believed that the Defendant had posted these negative comments, and Victim Payne admitted that he was "posting stuff about the Defendant and it was just going back and forth." Victim Payne told Jamie that "Chris" was not a real person and that he believed the Defendant was pretending to be "Chris."

Jamie talked with the Defendant and asked her to stop participating in the online feud, telling her, "the only thing you have to do is hit delete, just stop." Jamie urged the Defendant not to email "or say anything," but the messages and threats continued. On several occasions, Buddy would report various issues and concerns related to the online feud to the local sheriff, Mike Reece. Sheriff Reese advised Buddy that he should get rid of the computer since it appeared to be the "main" source of the Defendant's conflict.

Despite these warnings, the Defendant continued to post several times a day on Facebook that Ms. Thomas and Victim Hayworth were "mean" and "whores" and should be punished. The Defendant also posted similar messages on Topix about Ms. Thomas, Victim Hayworth, Victim Payne, and the victims' baby. One such post on Topix, referenced the baby as "that damn baby." Around this time, the Defendant "let it slip" to Jamie that "she was going to have to start calling [Ms. Thomas] again." When Jamie asked the Defendant about this comment, she "got real defensive" and "wouldn't say anything else about it." Jamie stated that, until that time, he believed that the Defendant was not engaging in any phone harassment of Ms. Thomas. The Defendant later told Jamie that someone was "spoofing her phone to make the phone calls" to Ms. Thomas but never mentioned someone "hacking her emails."

On the evening of January 30, 2012, the night before the homicides, Barbara called Jamie and invited him to the Potter residence to work on the computer. While at the Potter residence, Buddy came into the computer room and asked if Jamie would "do him a favor." Without specifying a date or time, Buddy asked Jamie to "take him down next to [Victim Payne's], let him out and go down the road and come back and pick him up." The Defendant and Barbara were not in the room when Buddy asked for this favor. After working on the Potters' computer, Jamie returned home. The Defendant then called him on his house phone and, as the two talked, the Defendant told him that Buddy wanted him to "help [ ] do something." After talking on the phone for a while, Jamie told the Defendant that he needed the phone line in order to work on his computer so the two

concluded their phone call. Jamie then received a text message from the Defendant's cell phone which read "don't take your cell phone with you in the morning."

In the early morning hours of January 31, 2012, Jamie's home phone rang. By the time he reached the phone, it had stopped ringing. Jamie's caller ID showed that the phone call came from the Potter residence. The Defendant then sent Jamie a text message telling him that Buddy "was trying to call [him]" and instructing Jamie to call Buddy. Jamie called Buddy, and Buddy asked him, "[D]o you remember that favor that I asked you[?]" Jamie responded, "[Y]eah[,]" and Buddy asked, "[C]an you do it this morning[?]" Jamie agreed to help Buddy. Moments later, the Defendant sent Jamie a text message that said, "Daddy's leaving[.]" Buddy then arrived at Jamie's residence. Jamie got in Buddy's vehicle, and Buddy drove to the parking lot of a church near Paw Bill's residence while it was still dark outside. When they pulled in, Jamie asked Buddy how far down he was to drive, but Buddy said that Jamie "may not have to go." Jamie and Buddy sat in the parking lot, and after Paw Bill left for work, Buddy said to Jamie, "[L]et's walk over here." Jamie and Buddy walked across a field towards Paw Bill's residence to a shed behind the residence. Jamie asked Buddy what they were doing, warning that if Victim Payne saw them "all hell [was] going to break loose." Buddy handed Jamie a gun, and Jamie told Buddy that he could not kill anyone. Buddy said that Jamie "wouldn't have to kill anybody" and that he just needed Jamie to "stand at that door."

Buddy and Jamie entered Paw Bill's residence through the back sliding glass door. Jamie stood at the door while Buddy went down the hallway and entered the first bedroom. Jamie heard Victim Payne say, "[W]hat the hell[,]" and saw Victim Hayworth run out of the bedroom and further down the hallway. Jamie then heard a gunshot. Moments later, Buddy came out of the bedroom and looked at Jamie. Jamie pointed down the hallway in the direction of Victim Hayworth, and Buddy proceeded down the hall. Jamie walked up to the first bedroom and looked inside. He saw Victim Payne lying on the bed. Jamie then heard another gunshot. Realizing what had occurred, Jamie ran out of the residence and back across the field to Buddy's vehicle. He gave the gun back to Buddy when Buddy returned to the parking lot. After the murders, Buddy dropped off Jamie at the end of his driveway. Jamie got out the vehicle, walked across the road, and "got sick."

Days after the murders, on February 2, 2012, Chief Deputy Woodard and Agent Lott interviewed the Potters at their residence on Hospital Road in Mountain City ("the Potter residence"), located approximately "[f]ive to eight miles" from the crime scene. A recording of the interview was played for the jury. During the roughly hour-long interview, Buddy, Barbara, and the Defendant denied any knowledge of the murders beyond what had been reported on television. The Defendant told the investigators that

the victims "had been harassing the living crap out of [her]." She explained that she first met Victim Payne through Ms. Greenwell. The Defendant recalled that, on one occasion, Ms. Greenwell took her rock climbing with a group of friends, which included Victim Payne. She stated that Victim Hayworth did not go rock climbing and that Victim Payne was dating someone else at the time. The Defendant recounted that she also attended a party at Paw Bill's residence with Ms. Greenwell but that the drinking, drug use, and weapons present at the party made her uncomfortable, so she ended up sitting out in the car in the driveway.

The Defendant told investigators that her problems with the victims began when the victims' friend, Ms. Thomas, cussed her out at Food Country for using a food stamp card. The Defendant said that, after this incident, "They made up three Facebooks of me using my picture." She claimed that they "hacked" into her social media accounts and harassed her. Barbara stated that after they "hack[ed] in," they threatened the Defendant, saying "We want you dead," and "I'll stomp your f***ing a**." The Defendant denied ever posting anything negative on the internet about the victims; she stated that she only asked Victim Payne, Victim Hayworth, and Ms. Thomas to "leave her alone."

The Defendant explained that she eventually went to court over claims that she was harassing Ms. Thomas. She recalled that, after one court date, she had to be carried out of the courtroom by Buddy and Jamie due to illness, and as she was being carried out, Victim Hayworth, Mrs. Osborne, and Ms. Thomas told her, "I hope you die." One of the investigators asked the Defendant why the victims and their friends were harassing her, and the Defendant stated, "It came out to be a jealousy thing. They said I was too pretty; that I wasn't from here so [I was] never going to be accepted." The Defendant also told investigators that one of the victims' male friends had threatened to rape her. The Defendant stated that she almost died due to the stress caused by the situation. She explained that she had "heart problems" and that the victims and their friends had known that she would get "very sick" under stress.

The Defendant further stated that Victim Payne "ran his mouth" about Buddy and Jamie selling drugs. She explained that Victim Payne was upset with Jamie because Jamie went to court with the Potters on the Defendant's behalf. The Defendant then recounted that Victim Payne had parked his truck by the Potter residence and shot a gun at the house. She stated that Victim Payne also shot a gun at Jamie's trailer. Buddy stated that he believed Victim Payne had been shooting over the Potter residence because he found no bullet holes in the structure. The Defendant stated that she ended up in the hospital after Victim Payne shot at their house. She said that Victim Payne told her, "I'm going to kill you. I'm going to get you at some point."

The Defendant stated that the situation had somewhat resolved itself following the final court date with Ms. Thomas on November 30, 2011. She stated that she had received one threatening email from Ms. Thomas since then, but she had not seen the victims or any of their friends. Barbara agreed that they had believed "it was all over" after the last court date. The Defendant recounted, however, that one of the victims' best friends, Nicky Church, hit her "for no reason" the week before the murders. The Defendant told investigators that going out with her parents did not guarantee her safety because "they" would kill Buddy and Barbara to "get to [her]." When asked about her relationship with Jamie, the Defendant denied that Jamie was her boyfriend. She claimed that he was "just a friend," who had worked on the Potters' computer "a little bit." Investigators left the Potter residence at the conclusion of the interview without making any arrests.

The "first break" in the case for investigators came approximately one week after the murders, when they interviewed Jamie for the second time at the Johnson County Sheriff's Department. It was during this meeting that Jamie confessed to his involvement in the crime. He told investigators that he was at Paw Bill's residence at the time of the murders and that Buddy shot the victims. Jamie explained that, when Victim Hayworth ran out of the first bedroom, he blocked the front hallway. At one point during the interview, Jamie asked Agent Lott if "the CIA was there." Agent Lott was confused by the question because he was unaware of any role or participation by the CIA, and none of the investigators had mentioned the CIA during the interview. At trial, Jamie stated that he participated in the murders because he was afraid of Buddy. He stated that he had not wanted to kill anyone and that he had never done anything violent before. He said that he felt "horrible" about the murders and that he considered Victim Payne "like a brother[.]" Jamie explained that he asked investigators about CIA involvement because Buddy had told him "he was with the CIA." He said that he was "hoping the CIA had [his] back" and that "Chris" was real; however, he acknowledged that "Chris" did not exist and never existed. Jamie testified that he was manipulated by the Potter family. He explained, "Well, I mean, I thought Chris was real. I mean, I thought that there was a, you know, someone that I was talking to there and the Defendant the way she would talk to me . . . it was like a -- a bonding . . . a family. And it's like it's all a lie."

At the end of Jamie's statement, Agent Lott asked Jamie to call Buddy. He instructed Jamie to ask Buddy what he had done with the gun and knife used during the murders. The recorded phone call from Jamie to the Potter residence was placed late in the evening of February 6, 2012, or in the early morning hours of February 7, 2012, and the State played the recording for the jury. On the recording, Barbara answered the telephone and spoke with Jamie for a few minutes. Barbara referenced "Chris" sending an email to her, indicating that Jamie had been arrested. She asked Jamie if he had taken a lie detector test and whether he had "passed" it. Buddy then spoke with Jamie. Jamie

asked Buddy if he "got rid of everything from Bill's." Buddy responded, "Uh-huh." Jamie then said, "Okay, that makes me feel a lot better," to which Buddy replied, "Yeah."

Following the recorded phone call, investigators obtained an arrest warrant for Buddy and a search warrant for the Potter residence and Buddy's vehicle. The search warrant was executed on February 7, 2012, after Buddy was arrested in connection with the murders. During the execution of the search warrant, Chief Deputy Woodard logged evidence in the living room of the Potter residence as other investigators brought items of evidence to him from various parts of the house. At one point, an investigator placed a stack of papers on a chair beside Chief Deputy Woodard to be logged. Barbara—who had been sitting on a couch in the living room beside the Defendant— reached over, picked up the stack of papers and ripped them in half. Chief Deputy Woodard instructed Barbara to "give [him] those papers." The stack of papers consisted of emails that contained several photographs, believed to have been taken from Facebook, of Ms. Potter, Ms. Thomas, and Victim Hayworth. Chief Deputy Woodard noted that, in one of the emails containing only a photograph of Victim Hayworth, the subject line read, "Billie whore[.]"

During the search of the Potter residence, law enforcement officers seized one computer with an external hard drive. In the computer room, investigators found a green spiral notebook on a desk next to the computer monitor, which contained passwords to various internet accounts, including passwords for both the Defendant's and Barbara's AOL email accounts. Thirty-two firearms and "a lot" of ammunition were also collected during the search. Additionally, investigators seized Buddy's truck. Agent Lott then turned over several of the seized items, including Buddy's truck, to the TBI crime lab for testing.

Following his arrest, investigators interviewed Buddy. After the interview, Buddy called Barbara. This phone call was recorded and played for the jury. During the recorded phone conversation, Buddy told Barbara that he was involved in the murders and that he "did it." He told her that he did it because of what "they" tried to do to Barbara and the Defendant. He stated that he "didn't want [Barbara] to be afraid no more." Barbara responded that he could not have committed the crimes because she saw him "sittin' there" at home during the time of the murders. Buddy told Barbara, "I love you. I did it to protect you." Barbara instructed Buddy, "[Y]ou are not guilty because you were here. You have to say that." She reiterated, "You were here. I saw you." Before concluding the recorded phone call, Barbara again said, "Don't worry, honey. You were right here. I saw, you right here."

When Buddy's truck was processed for evidence at the TBI crime lab, investigators found three trash bags of shredded paper under a truck bed cover. TBI

Special Agent Miranda Gaddes later pieced together some of the shredded documents. The paperwork was introduced at trial, and Agent Lott read portions from thirty pages of the shredded paperwork. The dates of the paperwork were from March 12, 2011, through January 25, 2012. Seven of the thirty pages contained no identifying information such as dates, email accounts, or names. The messages appeared to be between Barbara and "Chris." Many of the messages referenced attempts to obtain a CIA identification for Buddy.

Generally, the content of the documents is about the harassment the Potter family, specifically the Defendant, was suffering at the hands of Victim Payne, Victim Hayworth, Mrs. Osborne, and Ms. Thomas and contained disparaging comments about these people. Many of the messages included some sort of threat or desire for violence, harm, or death to this group. The messages from "Chris" indicated that he was watching the victims and their friends and was aware of the groups' plans to harm the Defendant.

One specific message from Barbara to "Chris," dated April 5, 2011, stated that Victim Hayworth, Ms. Osborne, and Ms. Thomas "need to die!" The same message referenced a conversation between Buddy and "Mike," who questioned Buddy's CIA affiliation. In another undated message, the writer urged "Chris" to "disable all of their vehicles" and asserted that "they have to go to prison or die." In a message printed from Barbara's email address, dated January 25, 2012, six days before the murders, "Chris," referred to "whore Lindsey," noting her upcoming birthday on January 28 and his "hope" that "she die[d] before then."

Following this discovery, Agent Lott began to focus the investigation on the electronic communications among the Defendant, Barbara, "Chris," and Jamie, leading up to the murders. Agent Lott collected evidence from three primary sources: email accounts, Facebook, and the Defendant and Jamie's cell phones.

### Email Communications

The email address associated with Barbara was bmp9110@AOL.com, the email address associated with the Defendant was BUL2DOG@AOL.com, and the email address associated with Jamie was sleepiingbear@yahoo.com.[7] Law enforcement obtained subpoenas for records from Yahoo and AOL in relation to the aforementioned email accounts, and Agent Lott received a DVD containing thousands of emails.[8]

---

[7] Jamie confirmed at trial that sleepiingbear@yahoo.com was his email address. He also identified the Defendant's email address as BUL2DOG@aol.com and Barbara's email address as bmp9110@AOL.com. At trial, Barbara's daughter, Ms. Groover, confirmed Barbara's email address.

[8] Defense expert, Keith Jones, testified that there were over 20,000 emails recovered from the Potters' accounts.

Agent Lott also sought subscriber information and internet records for Jamie and the Potters, who had internet service and landline service through Century Link, an internet, telephone, and television service provider. Deborah Evans, a Century Link employee, retrieved subscriber information and internet records for Jamie and the Potters. Ms. Evans explained that Century Link differentiated between customers based on subscriber information, "network circuit path ID's[,]" which "show how a path for an internet customer goes from a central office to their home," and IP addresses. "IP" stood for internet protocol, and this protocol was how messages were routed throughout the internet and throughout computer networks.

Ms. Evans testified about IP addresses as follows:

IP addresses are a group of numbers that are assigned to a customer when they attempt to log on to use the internet. If it's a dynamic IP address it can change, that group of [ ] numbers will change. If it's a static IP it remains the same and those are usually used for huge companies.

Ms. Evans explained that the data related to a customer "logg[ing]" onto the internet was stored in Century Link's data server at their central office. Ms. Evans retrieved multiple IP addresses that were associated with Jamie's and the Potters' Century Link accounts during the time period of January 4, 2011 through February 21, 2012. Both Jamie and the Potters had dynamic IP addresses. Ms. Evans provided Agent Lott with these records, and Agent Lott refined this data into a chart showing the associated IP address used at each residence and on what date.

The State showed Ms. Evans a redacted sample email, and she explained to the jury the various fields on the header of the emails. Specifically, she identified the Century Link IP address in the final field of the header.

Agent Lott identified documents "known" to be drafted by the Defendant or Barbara. He explained that he used these documents to identify patterns in the writing for comparison with emails from the defendants' Yahoo and AOL accounts. In his review of the emails, Agent Lott found emails sent from the Defendant's account, BUL2DOG@AOL.com that purported to be from "Chris."

With respect to Barbara, Agent Lott reviewed Barbara's typed-written statement, which she prepared in Chief Deputy Woodard's presence, as well as emails that Christie Groover, the Potters' oldest daughter, identified as being written by her mother. Agent Lott highlighted, in yellow, patterns in Barbara's writing such as the use of the abbreviation "yrs" for the word years; the use of the ampersand symbol; "tho'" instead of

though; "thru" instead of through; and the frequent use of hyphens, dashes, and parenthesis. Barbara used alternate words separated by a forward slash "quite often" in her writing. Agent Lott said that he also observed that Barbara began many sentences with "oh well" or "anyway" and frequently used ellipses. Common to both the Defendant and Barbara was the abbreviation of the word people to "PPL." Barbara employed many abbreviations within her writing. Most often Barbara used "B C" for the word because, but "a couple times" she used "B/C." Additionally she used the abbreviation "PLS" for please and "rec'd" for received. She also used the term "hang in there" or a variation of the phrase (hanging in there, hung in there) in the documents.

In reviewing the Defendant's known writings, Agent Lott observed that the Defendant often left a letter or two out of a word and capitalized words that did not require capitalization. The Defendant frequently used run-on sentences and transposed letters ("siad" instead of "said"). The Defendant's writing contained frequent separation of a single word into two words, such as "out side." The Defendant often began sentences with "and." She failed to use double consonants where required before adding a suffix and left the "e" in the root word when adding "ing." ("leaveing" rather than "leaving").

After highlighting the documents, Agent Lott created a legend of Barbara's and the Defendant's writing patterns. He then compared the documents with emails sent from the Defendant's email account to Jamie. Agent Lott also compared IP addresses associated with the Potter residence and Jamie's residence during the time period from January 2011 through February 2012 with the IP addresses contained in the header of the emails during the same period.

The State introduced a September 30, 2010 email sent from the Defendant's email address to Jamie's email address for comparison of the writing to the Defendant's identified writing patterns. The subject line of the email indicates that a portion of the email is from "Brian," who is responding to an inflammatory email sent to the Defendant. The second paragraph appears to be the inflammatory email that was the subject of "Brian's" message. The email is as follows:

> Brian G ::::: Jenelle who in the Hell is doing this to you? Oh I'm madder then Hell and so is Shaun, You are not this person we all grown up together as great friends. God Jenelle You're a wounderful sweet careing kind hearted and kind and will do anything for anyone . And put everyone first before your self dear. I'm so soryy that you have ahd a rough life and you have always been a fighter and you stand up for others and even try to see the best in everyone. I dont know these girls and I dont know why they are after you so much but you're a way better person Jenelle. You never saw it

but it was up here too but the girls up here loved you and they miss you we all do but they are nuts down there. I told you I would never date a girl from TN this makes my point.  dont pay any mind to them. What ever happends to John we will all pay for him. No one needs to die but if he did do it none of us can ever trust or be friends with him you know. Pray Jenelle your best at that. Love your friend Brian and tell Mom and Dad I said hello thank you .

[Alleged email sent to the Defendant]

OK did you see where Jenelle's little friend John is in jail and for  touching and taking pictures of little girls and putting them on the net. EWWWW I hope he die's . I bet Jenelle is on it too. Eww she is so ugly anyways just look at her ugly face. and her Body eww she is sooo fat and she needs to lose a lot of weight. she ugly to look at . But anyways is with her ugly Ass and wont be with someone who would be kind to him and sweet and loving. He has even said How he hates her and dont like her and why is he even with her. he could do so much better, I hope she just kills her self. she is so mesed up. She is just little ass hole and she might be smart but she is ugly in every way. YUCK YUCK. she looks like a damn duck. I hope she gets killed soon.
[Victim Hayworth] and Lindsey  let this get back to her.

Agent Lott noted the improper capitalization, transposing of letters, and the remaining "e" from the root word when adding the suffix "ing" consistent with the writing in the known sample writings for the Defendant.

The State submitted 209 pages of printed material associated with Barbara's and the Defendant's email addresses.  These pages constitute sixty-seven emails sent between three email addresses: Barbara's email address, the Defendant's email address, and Jamie's email address.  The emails begin on January 1, 2011, and the last email is dated January 16, 2012.  Although there are only three email addresses, there are four identified writers in these communications: Barbara, the Defendant, "Chris," and Jamie.  All of the emails that identify "Chris" as the writer of the message come from the Defendant's email address or are messages that have been copied from the Defendant's Facebook account.  All messages identifying Barbara as the writer come from her email address.

We summarize the emails chronologically but note that there are three main categories of emails, messages between: (1) Barbara and "Chris;" (2) "Chris" and Jamie; and (3) Jamie and Barbara.  In addition, there was one email sent from the Defendant to

Jamie. The communication between "Chris" and Barbara ranged between January 1, 2011, and December 16, 2011. Most are sent from the Defendant's email address to Barbara's email address; however, several, which are messages copied from Facebook, are sent from Barbara's email address to Barbara's email address.

The initial messages between "Chris" and Barbara contained information about conflicts with extended family. As the months progress, discussion of the family conflict diminished, and the focus of the messages between Barbara and "Chris" became the victims and Ms. Thomas. Throughout the emails, "Chris" shared information about his work with the CIA and referenced local law enforcement as "dumb" and ineffective. He wrote about his intervention in the harassment by the "mean girls" and how he defended the Defendant, whom he described as a "good person" and as "trying to make peace." He warned Barbara of potential threats to her and the family's safety.

In an email dated January 1, 2011, sent from the Defendant's email address to Barbara's email address, the subject line indicated that the content of the email was messages between "Chris" and Barbara that had been copied from a social media website on December 31, 2010. "Chris" wrote to Barbara about his work with the CIA, claiming that he "got rid of" people in Russia and New York. He wrote that he had shot "a lot of" people while working for the CIA. He explained, "I got toa point where they were bad ppl and i new it was us or them so i had to kill. But i love to shoot now. and Killing does not borther me at all." He indicated that he was "no longer scared" of Ms. Groover because he could "Kill her at anytime and your family in PA  i have has each one of them inmy sights and i can get to them anytime. I just might." He informed Barbara that he was still working under the name "Cody Wize" at work. He warned Barbara of potential threats to her safety and advised that she should not go to her mother's house alone. "Chris" wrote that he would work on getting "everything off" of Topix, noting that he had "so much on them all." He concluded with "I love you all" and "your son Chris."

The rest of the content of the email appears to have been cut and pasted from other sources. The first response was from the Defendant's email address written to "'Cody'" and signed by "Mom Barb & [the Defendant]." The second message was written to "Chris" and signed by "'mom' Barbie." In the second message, Barbara wrote about her desire for the Defendant to have someone to "take care of her and be good to her." She continued:

> These guys down here are trash and we threw the last one out last year in
> Jan. – jerk Jamie Curd. He took advantage of me, & was dirty, muddy, and
> walked in the house any old time, even when [the Defendant] was in the
> hospital one time! He did not have good manners and smelled too. He
> used to hang out with [Victim] Payne, the 'maybe' father of [Victim]

- 25 -

Hayworth's baby, not sure yet, and he is running a whore house you know. We would not let her go out in the car with him bc he had a trap for a car and we did not have a trust with him. She did not want to go out with him either. She is such a good person.

Barbara updated "Chris" on family conflicts and then transitioned to harassment by the victims, as follows:

We have no way to fight back.and when we went to the Sheriff's office, they gave us lip service. The guys' name was Brad Sutherland and he told us what a sharp computer kind he was and he'd take care of it all. [The Defendant's] 3 names disappeared once, but they added them back on. Isn't that awrful – [Ms.] Thomas and [Victim] Hayworth started it for some crazy reason bc they saw [the Defendant] out and got jealous of her looks…but we never joined topix and will never do so.

In two emails, Barbara referenced Jamie disparagingly and mentioned that Buddy "warn[ed]" Jamie "to never come near [the Defendant] again." "Chris" wrote back in defense of Jamie, writing that Jamie "told everything" on Victim Payne and that Jamie no longer went to Paw Bill's residence. "Chris" wrote that Victim Payne had been "hateful" to Jamie since Victim Payne began dating Victim Hayworth.

In a March 3, 2011 message sent from Barbara's email address to Barbara's email address, Barbara wrote to "Chris":

Bud was wondering When he would be contacted to meet and pick up his ID you spoke of some time ago. Just for YOUR info, He IS home every day now (as I am home), he can come alone bc The Defendant can be w/me,. HE is Actually wondering IF there is an ID or not!

"Chris" responded:

Yes I saw the ID they have not gave it to him yet??? That's what makes me so mad they say they will do it and they have not called him. I even TOLD my BOSS about it and he said yes and that he would get Tommy to talk to him. I don't understand them I will say something for Buddy b/c he does have it and I have seen it and is just like ours.

Barbara then responded:

- 26 -

Thanks for bugging them anyway Chris, but if they have decided Not to give the ID to Bud, we have to understand. He'd really like to be involved in a lot of things, espec. [Ms. Groover], cuffing her when time comes, etc.

In a message dated March 3, 2011, Barbara recounted another alleged incident between Ms. Thomas and the Defendant. She wrote:

[The Defendant] will Never be alone w/o one of us in the trucks or with her in a store, so THEY better Watch Out! We are Tired of all of this s**t Chris! 7 yrs. Is 7 yrs. Too many & it is soon going to have to be over. (You are welcome to shoot any of them, but let [Ms. Groover's] body be found- we have life ins on her so may as well collect it…I know that sounds mean for a mom to say,but she hates me, wants me dead as well as [Buddy] & [the Defendant]..)

In a message from April 2011, Barbara wrote,

they need to back off. Bud[dy] is sooooo mad, &I'm 100% behind whatever happens. You guys meet when you are ready Chris. Maybe Bud[dy] will have ID by then & can use CIA guns, etc. for his protection- get the jobs done. ya know. They all need to go & the ones left need to be given a big scare as they watch & wonder "am I next?"

Barbara urged Chris to "[k]eep scaring up these 3 girls w/guns,etc.&breaking their cars . . . . Make things hard for them bc they are making life hard for us."

"Chris" responded to Barbara on April 16, 2011, writing that "Mike"[9] was bad news and that he could not wait to kill Mike. He then said, "Next is [Ms. Thomas] and [Victim Hayworth] and [Victim Payne] and then cops i want to get." He also referenced the CIA ID and informed Barbara that Buddy was "in the computer as CIA and that's all that matters." "Chris" expressed concern about the Defendant's well-being because those "girls have really broke her[,]" and he reiterated that he would "kill them." Barbara wrote about carrying a weapon, and "Chris" encouraged Barbara to do so. "Chris" told Barbara that the victims were "talking really bad about the Defendant." "Chris" reiterated that he will kill Ms. Thomas "and [Victim Payne] then [Victim Hayworth] for sure. Then cops." He then wrote,

---

[9] Based upon the entirety of the email exchanges, it appears that "Mike" was, Mike Reece, the Johnson County Sheriff at the time.

"Well buddy can kill them before they will so no worries there. Dumb bitch ho. She needs her butt kicked good and left. And maybe run over and a bullet in her head. Then she would be a dead pan whore face bitch. LOL Karma it will come back on her. I hate everyone one of them. LOL."

On April 21, 2011, an email was sent from the Defendant's email address to Barbara's email address with the subject line, "what linsday said." The email appears to be an antagonistic email from Ms. Thomas to the Defendant. In the message the writer identifies herself numerous times as "Lindsay," calls the Defendant names, and threatens the Defendant. In part, the message threatens, "your ass is mine your a f\*\*king b\*\*ch remember that I can get you and will. your daddy cant do sh\*t to me. I'm above the law dumb f\*\*king b\*\*ch."

In a May 10, 2011 email sent from the Defendant's email address to Barbara's email address, "Chris" expressed frustration over the ongoing harassment. He stated, "I wish I [k]new someone that would kill her while I'm here. But if you want [to] kill her and nothing will be asked for sure. I mean a missing person is a missing person." Later in the message, "Chris" told Barbara that he feared that if the Defendant went to jail, she might commit suicide. He then offered that everything would "be alright," concluding "I'm sure Buddy is on top of everything."

Barbara responded to "Chris" in a Facebook message on May 12, 2011. She updated additional acts of harassment that now included acts toward Jamie. She expressed fear that the Potters' and Jamie's homes would be set on fire. On June 1, 2011, Facebook messages between "Chris" and Barbara were emailed from the Defendant's address to Barbara's email address. In these copied Facebook communications, Barbara asked:

If you come back, do you have 'plans'? like talked about before for her espec. And for others? I hope they will let you do what needs to be done, and Bud[dy] is ready to help you. Though he needs an ID, he says in this town, they only look at the computer. He has thought and thought of ways & is ready…just needs another guy.

In a lengthy email from Barbara to the Defendant, sent on June 13, 2011, Barbara wrote about the Defendant's upcoming court date and about Ms. Thomas, Victim Payne, and Victim Hayworth. She wrote to the Defendant:

Remember I'm here if you want to talk. Dad don't mean to sound like he don't care. He is trying to make you think it is nothing, but all things bother him, they do . . . he talks to me about it. He is concerned, but

- 28 -

doesn't want to worry you.  I care; you know that**.**  I do all that I can and I'm here to listen and plan or whatever you need….just come to me. K? K.

On June 21, 2011, in an email sent from Barbara's email address to Barbara's email address with the instruction "PRINT!," Barbara wrote to "Chris" about Jamie in a more positive light for the first time:

*anyway, a note to let you know this….I called Jamie this evening & talked for a while, then Bud[dy] talked to him.  **He is coming here on Thurs at noon to see us/talk for a while**…so will try to tell you some in 'code' but he can tell you All –if he wants to.

Later in the message she wrote, "*I dread the future w/[Victim Hayworth.]"

In a June 30 Facebook message exchange between Barbara and "Chris" that was copied and emailed from Barbara's email address to Barbara's email address on July 11, 2011, Barbara noted in the closing of her message, "Bud will call Jamie."

Chris responded with the following:

[Jamie]'s just mad about how they are buging You all and Him and he wont take it. He would kill her if he had someone he siad. He know's some ppl that would help him but he said trusting someone you know. He don't want anyone to talk. But yes i think if he and buddy would meet it would be a good thing. Before July 27th and let him tell you how he found out everything and he know's them girls was well so he can pretty much tell you if your going to have any isssues with [Victim Payne] or [Victim Hayworth] next and he know's a lot. . .  But please just talk to him .

After writing about his health and his work, "Chris" returned to the topic of the harassment:

I'm not sure what Lindsay and her boyfriend are up too and her Dad is not a man to mess with. But i still think buddy can take him down if he had to come to that. Now i know why ppl take care of there own issues with ppl kill them[ ]and no one cares. pretty much. I have head it and seen it for my self. I got ride of 2 and no one cared nor asked anything. lol. you can get away with it. She needs to be killed and [Victim Hayworth] and i don't care if i killed that baby and her b/c she going to make it into her. Who wants that s**t f**king a**hole's and whores. makesme so sick.

- 29 -

Barbara responded to "Chris's" message about Jamie as follows:

**About Jamie, yes, everything's okay with us about way back then. We don't dislike him in any way. Bud[dy] really wants to meet with him but he thinks he works all the time. I told him to give him a call and meet him out somewhere or over his house. It needs to be done asap. He says he will. . . . Bud[dy] wants to meet w/him...he just kind of thinks that Jamie can't help him w/anything, ya know, like he'd like, so he don't know if info would do him any good.

On October 9, 2011, an email from the Defendant's email address was sent to Jamie's email address with the subject line "this is from linsd[e]y from c." The message called the Defendant names and threatened that Victim Payne was going to kill the Defendant.

On October 25, 2011, an email exchange between the Defendant's email address and Jamie's email address began at 10:05 p.m. and ended at 10:57 p.m. The communication was between "Chris" and Jamie. The initial messages concerned Jamie's going to see the Defendant, who was "sad." Jamie wrote that the Defendant "need[ed] a break from here" and that he wanted "to make her happy an[d] give her p[ea]ce of mind."

The email exchange between Jamie and "Chris" continued:

Jamie (10:36 P.M): no they shouldn't an def[initely] not her [the Defendant] is to[o] good of a girl to have to put up with this sh*t an[d] man words can't start to say how much i love her i see the love she has for me an[d] that[']s something i thought i[']d never see not from this sh*t hole but she is my ray of light at the end of the tunnel

"Chris" (10:38 P.M.): [The Defendant] really loves you man she has never loved anyone like she loves you i see it all over her. and you are very blessed for sure. and you have a great girl and these's mother f**kers just want to make her life hell and i hope she dont think about killing her self. she has you to live for. and her [Barbara] and [Buddy].

Jamie (10:43 P.M.): i think that if it wasnt for us she might have thought about it didnt say it but i can tell she is just took all she can take an thoes mother**kers wont let up there crazyer than hell idk why they have to do this i know there life has to sux to the point that they see this as a sick joy or something dumb bastards

- 30 -

"Chris" (10:45 P.M.): i agree withyou man and it's sad they have to do this to [the Defendant] and herfamily and you and it's not right you know. It's so sad. I'm sad and i do pray for you all. And she just put upsome new pics on facebook you might want to look she is cute.

Jamie (10:47 P.M.): just to see [the Defendant] happy makes my day i am blessed she is a gift from GOD she showed me what love is an thats something i thought id never find id gave up till i meet her i love to see her smile

On October 27, 2011, "Chris" emailed Jamie again, writing:

Hi Jamie
It's Chris, I wanted to say hello and I thank you for being there for [the Defendant] and Her Mom and Dad. They are good people and what others say about them is wrong. I know you have taken up for Her family and her. It means a lot to me. Well Anyways I hope you all can get her out on saterday and also you can still do what you wanted. Make sure you have Candles and make sure you have a card and make the bed really pretty and just love on her. Thank you for being the one there for her. She need's you in more way's then one. she is a wounderful sweet careing girl. She would do anything for anyone before her self. But i know you know this about her. She is a good person. These's girls are just driving her so crazy and you know they are crazy. But what they are doing is still f**king wrong and hurting her like they are. There is no reson for it. Just b/c she is sweet and very pretty prettyer then them. They need to get over it. They just love to pick but from what i know. This Demon thing came to us from them. I think it really came from [Ms. Thomas] and [Victim Payne] from what I'm hearing and learning from. It's waiting on him and something will happen to them in time. With you and Buddy I hope you all can get them. I hope it all works out great. I hope that you will pray about it and Buddy is and that you know what you are all doing is great. Your going to help the town.) wish i could kill them but right now i really can't. But anyways I'm so happy that you and [the Defendant] are happy together and love each other so much. Have Lori call [the Defendant] and ask her to go out on saterday. thank you. But pray for [the Defendant] i know she is having a very hard time and she just needs someone like you and I'm so happy and blessed she has you. Well take care dude and I love ya. You are my brother and thank you for being a true blessing to my Sister. Take care and God Bless

- 31 -

Chris

Jamie responded, "[I] just w[a]nt to make her happy an[d] it hurts i cant do it more of[t]en she is my everything her happiness is my sunshine." Several more emails were exchanged on October 30, 2011, with "Chris" detailing the harassment and its effect on the Defendant, *i.e.,* "it's going to kill her," and how much the Defendant loved Jamie. Jamie then responded, expressing his devotion to the Defendant and his frustration with the circumstances. He also shared that he was intimidated by Barbara and Buddy and wrote that it was like "walking on egg shells." "Chris" assured Jamie not to "worry about" Barbara, that Barbara would "be fine." "Chris" coached Jamie on how to find favor with Barbara by showing Barbara how much he cared about the Defendant and calling and talking with Barbara.

On November 1, 2011, Barbara sent Jamie an email about the "junk" on Topix. She stated that she was "highly pissed" about the "hurtful, lies." She wrote, "[B]ut good ol Chris went after them big time as 'Matt Potter' and he tells them off something awful." She wrote that the Topix postings had "upset" the Defendant and were making Barbara sick. Barbara warned Jamie about the victims, stating:

> I feel bad for you bc how they run you down, its terrible. You are not the bad person they li[ ]ke to say you are….they even told the police last year that you were in trouble & bad & to keep you away from our house! . so you see? Can't trust [Victim Payne] or any of them. I feel bad for you. Know this. You are Not alone. We are here and we care bout you a lot.

About the victims, Barbara told Jamie, **"**I know they think that I'm a little sweet lady who won't do anything but just smile and be nice to them, never carry a gun, but they are dead wrong....I hide my anger and readiness well."

On November 7, 2011, Barbara sent Jamie an email with the subject line "HI JAMIE – ITS BARB – ONE MORE FAVOR FOR ME/BUDDY?" She asked Jamie for more help with their computer. Specifically, she asked Jamie to remove all of the Defendant's postings on Topix as well as a specific "statement about Buddy," questioning whether Buddy had received a medal during his military career. Barbara told Jamie that the Defendant "had a bad evening," attributing a recent incident of harassment as the cause.

In a November 10, 2011 email from the Defendant's email address to Jamie's email address, "Chris" expressed anger about more acts of harassment toward the Potter family. He wrote, "I can't wait for you and Buddy and us to do our Job's." He assured Jamie that he should not be concerned about Barbara, but encouraged Jamie to call and

"talk to them." "Chris" routinely concluded his emails with "Love always your brother," "your brother," or "Love your Bro."

Barbara emailed Jamie on November 16, 2011, with the subject line, "Hey Jamie – Weds….. 11/16/11 ---- READ ASAP."

Hi Jamie -
Thanks for all of your help and support thru this thing. We're all tired but up. I'm getting a shower and laying back down - unless end up getting Jen something or to the ER/or hospital w/her.
**I just wanted to tell you that I looked at Your Facebook account to see if Lindsey said anything to you at all and your comment to her is Gone! You might want to go into it again -- jackwright94yahoo.com is your email and your password is "mexall"**
**Just go into Facebook(thru typing it on search line on google or yahoo), then type in your email and password (see above), enter, & you're into your own FB-facebook page--Jack Wright's. [smiley face emoji]**
**Then on the search line at top of Your FB page just type in Lindsey Thomas and she comes up. I looked at her page, but don't see any mail from you to her may have to try again....**
        . . . .

**\*I did write to Chris earlier and tell him to never use last names on facebook but the ones he wrote in the other night he has already deleted anyway (but they'll show up in cookies; right? right) ..but [Victim Payne] has a copy/pic of that screen now anyway so he will go after Jen for that & lots of other things that are in his little brain I'm sure. They are all 'fixated' on Jenelle, and/or us! grrr But anyway, its Chris that is putting their whole names on, not Jenelle. He added another topic on Topix called, Lindsey Thomas, Lindsey Potter and [Victim] Hayworth - and is telling them off again--you can see it.... I know [Victim Payne] thinks that this is all Jenelle, or us, doing this - but its Not and I explained it all to Chris anyway.**
**Jenelle is very sick, throwing up and shaking today, so it doesn't look good. She may end up at the hospital again, but Buddy will Still be around for later on.**

On November 23, 2011, Barbara sent an email to Jamie with the subject line, "Hi Jamie – from Barbie --------About our phone call today 11/23/11." Barbara referred to their phone conversation wherein she told Jamie about recent communication with "Chris." She relayed "Chris's" warning to Barbara about Victim Payne's and Ms.

- 33 -

Thomas's plan to "get [the Defendant] in jail" before "going after" Buddy and Barbara. Barbara expressed her concern over the Defendant's being put in jail and what "a scary time" the family was going through. She wrote, "They are trying to kill [the Defendant] little by little (but doc says that at this rate, it could happen anytime w/heart attack/stroke, DKA itself-that she is getting it too often now & the stress has to stop)." She stated that the victims would not stop "until we're all dead/gone" and that "the cops are behind [the victims] and [Ms.] Thomas per Chris."

On November 6, 2011, an email was sent from Barbara's email address to Barbara's email account with the subject line, "SEND LATER – WHEN WILL GO THRU –TUES, 12/6/11." The message was from Barbara to "Chris." In the message, she warned that "if someone wants to bring it on, they will All die, including the baby." Barbara wrote disparagingly about Victim Payne and Victim Hayworth and then asked "Chris," "So you think that it will be in a week or so – things will be happening – we are thinking different/sooner..and ready…well we will see – it may be sooner than anyone thinks." Barbara wrote, "[W]e want peace and no one here wants to kill anyone, but we will." She wrote about the police being "useless" and that she would do whatever she had to do "to save my kid or myself." She wrote that she no longer called 911 because "we are ready to take care of this ourselves." Barbara compared herself to a mother lion, writing "I'll do whatever it takes to save my young!" She threatened, "I will kill if I have to, not just hurt but kill."

On December 12, 2011, an email was sent from Barbara's email address to Barbara's email address with the subject line "PRINT –Messages fr/to Chris-week of December 4, 2011-them harassing, etc." In one of the communications, "Chris" wrote, "Please tell J and B it's ok and we have there backs and to just make you and [] [the Defendant] safe."

On December 14, 2011, Jamie emailed Barbara offering to "get rid of the files that slow [her] computer." He wrote, "I hope every oneis doing good an[d] [the victims and Ms. Thomas] will get whats coming to them."

On January 9, 2012, the Defendant sent an email to Jamie. Her email read as follows:

Hey baby
I love you so much and I thank you for everything you have done for me and given me. You are the very best and Your not just my best friend but you are the love of my life and ever will be. Your my Husband and You will always be in my life and You make me so happy and smile so much and I can't see my life with out you and i just wanted to let you know you are my everything and you mean the world to me. You are truly my other

half and my heart and so much more. There will never be a day that goes by i will love you more and more. Your awesome and your my soul and heart. I love you sooo much. You are loved and needed and wanted. Your just my life. I hope you know all of this. But incase you didn't you know now. I will always be in your life and i will always Love you and be in love with you and need you . Your not just a part of me you are all of me.
I love you so much baby.
your wife
Jenelle

On January 16, 2012, two weeks before the murders, an email was sent from Barbara's email address to Barbara's email address.  The email contained two links: "Can God Forgive a Murderer?, Christian News" and "billy graham-questions about forgiveness & murder – AOL Search Results."

## Facebook

Agent Lott testified that he obtained between 2700 and 2800 pages of content from the Defendant's Facebook account.  The State introduced approximately 100 pages of this content.  The postings submitted began on January 1, 2011.  On the Facebook documents, the "User" name associated with the account appeared when the account holder commented or posted.  Numerous times, the "User" "Jenelle Potter" would post a statement, and then the "User" "Jenelle Potter" would respond to the post writing as another person, usually "Chris."

The substance of the posts and comments on the Defendant's Facebook account were largely about the Defendant's illness and the harassment she suffered from the victims, Ms. Thomas, Mrs. Osborne and Mr. Osborne.  She referenced the "hacking" of her account multiple times and directly addressed the victims, Ms. Thomas, Mrs. Osborne and Mr. Osborne about their alleged harassment.  She also posted pictures of "Cody" or "Chris" and referenced his involvement with the CIA.  Using the Defendant's Facebook account, "Chris" posted threats to the victims and others.  One such post, dated December 14, 2011, reads as follows:

TO [VICTIM] PAYNE, [VICTIM] HAYWORTH, LINDEY THOMAS AND TARA [OSBORNE] AND BRAD [OSBORNE] AND ECT: PLEASE LEVE [THE DEFENDANT] ALONE AND STOP WITH THE HARASSMENT AND STOP TRYING TO RUN HER LIFE. LOOK AT YOUR OWN LIVES AND WORK ON THAT. B/C YOU ALL ARE JUST A BUNCH OF WHITE TRASH NO GOOD UGLY PEOPLE THAT LOVE TO HURT OTHERS WELL YOU NEED TO THINK OF THIS

TAKE CARE OF YOUR KIDS [VICTIM PAYNE] AND [VICTIM HAYWORTH] AND LINDEY GET OFF YOUR METH DRUGS AND STOP GOING AFTER MY SISTER AND MY FAMILY THANK YOU. ORYOU CANJUST GO JUMP OFF A MTN FOR ALL I CARE YOU ALL NEED TO GET OUT OF MY SISTERS LIFE.

On two occasions, Barbara posted using the Defendant's account but included her name or identified herself as "[the Defendant's] mom." One of the posts, dated December 12, 2011, read as follows:

TO: [Victim Payne], [Ms. Thomas], [Victim Hayworth], [Mrs. Osborne], all of U & you're no good evil friends! – Leave [the Defendant] alone & she Won legally in court – the Judge knows you ppl - @[1538392444:2048:JenellePotter] is not well at all as you all know & she is sick today. I'm asking you nicely to Please Stop the harassment. May God have mercy on Your souls. Thank you … [the Defendant's] mom…

In the other message, Barbara referenced the hacking of the Defendant's Facebook account as harassment of the Defendant.

The Defendant, in posts, claimed that Ms. Thomas was "calling [her] house all[]the damn time[,]" had "cuss[ed] out [Buddy] and [the Defendant] both[,]" and had "been in [her] back yard at night[.]" The Defendant also repeatedly referred to the harassment without naming anyone specifically and instead referred to "mean girls" or "mean people" in her community. It was common, in the Defendant's references to the victims and their friends, to name call and make accusations and threats.

On April 30, 2011, the Defendant stated that Ms. Thomas, Victim Hayworth, Victim Payne and "a few others" had threatened to kill her and then Buddy. She explained their motive as follows:

But it came out they dont like me b/c i'm smart and i'm very pretty and they cops are mad b/c they go up there and lie and they they come to [ ] me and ask me things. And now they have stoped b/c dad went up there and kicked there butts.

On November 21, 2011, the Defendant listed both "Chris Potter" and "Matt Potter" as her brother on Facebook. "Chris" posted on the Defendant's page a message to Barbara on November 14, 2011, which read, in part, "[Victim Payne] and [Victim Hayworth] are awful at even being parents and they should not be able to have kids. I hate them and [I] see what they do and drink and p[ar]ty and they are E[vi]l B[******]

[The Defendant] is not going to jail." The Defendant often posted comments like, "God will ha[n]dle them and something is going to Hit them." On October 22, 2011, the Defendant recounted in a Facebook post her day in court that caused her to become stressed and her blood sugar so high that she had to be escorted out by Jamie and Buddy and hospitalized. She stated that, as she was leaving the courtroom, "they" said, "[W]e hope she dies[.]" The Defendant posted, "They want me dead," and she claimed that "they [were] saying they [were] going to kill [Buddy] then [her]."

On December 26, 2011, the Defendant posted photographs of Jamie sitting on a couch with Barbara and Buddy on either side of him. On January 14, 2012, Barbara posted on the Defendant's Facebook page, complaining about "Evil ppl" and asking that "God . . . have Mercy on their souls[.]" The Defendant posted on January 14, 2012, "I'm sick of hearing they want me dead and [Ms. Thomas] want[]s to kick my butt it's never going to happen [I]'m never alone and my Dad carry[]s guns and my Mom, so they just need to back off. We have no law here and it makes me sick."

Based upon the references to "Chris" on Facebook and in emails, Agent Lott began attempting to locate "Chris." Johnson County Sheriff Mike Reece and Chief Deputy Woodard were unaware of any CIA activity or a CIA agent named "Chris," and Agent Lott was unable to identify a "Chris" working for the CIA in Johnson County. A few references to "Chris Tjaden" on Facebook and in emails led the investigators to believe that this was the last name of the "Chris" writing to Barbara and posting on the Defendant's Facebook account. Accordingly, investigators traced the name Christopher Tjaden to the Defendant's former classmate, an individual living in Delaware**.**

Mr. Tjaden attended high school with the Defendant and recalled her as being "very strange." Mr. Tjaden and the Defendant were in two classes together but he had spoken to her only occasionally because they had separate groups of friends. Mr. Tjaden had never met Barbara or Jamie and had never worked for the CIA. Mr. Tjaden stated that he had not had contact with the Defendant since he graduated from high school in 2000.

Mr. Tjaden viewed the photographs from the Defendant's email account purporting to be related to him. The photographs were of "chris's dog Little maggie," a red Ferrari, a man and woman, and photographs of men alone and in groups. Mr. Tjaden did not recognize the dog, or the red Ferrari. The photograph of the man and woman purporting to be "Chris's" wife and her brother was not a photograph of Mr. Tjaden's wife or her brother and he did not recognize the man or woman in the photograph. He viewed three additional photographs claiming to be of him and confirmed that he was not in any of the photographs.

Mr. Tjaden testified that he was not in a photograph contained in an email sent to and from Barbara's email address on September 1, 2011, with the subject line "Pic of CHRIS, our son[.]"  This email contained text that read, "this is Chris TJaden back at youth camp, w/ Jenelle – age 18 or so (our son)[,]" along with a blurry photograph of two people wearing what appeared to be military fatigues.

When shown a photograph attached to an email sent from the Defendant's email address to Barbara's email address on September 13, 2011, Mr. Tjaden identified himself in a photograph, recognizing it as one of his profile pictures from his Facebook account. Mr. Tjaden identified the same photograph in an email sent from Barbara's email address to Barbara's email address with the subject line "Pic of Chris-Barb cropped & enlarged/plus auto adjust/contrast/brightness..5X7[.]"  Mr. Tjaden identified himself in two additional photographs, one at a baseball game and the other standing next to his patrol car, in an email sent from the Defendant's email address to Jamie's email address on October 22, 2011, with the subject line, "Me Chris."  Mr. Tjaden explained that he had previously used both photographs as profile pictures on Facebook.

### Cell Phone Communication

Agent Lott obtained from Verizon a report of a seven-day period for text messages and a call log for Jamie's cell phone.  The records included a compilation of text messages sent to and from Jamie's phone and a document showing telephone calls between the two phones and between Jamie's phone and 423-291-1415, the Potters' landline phone ("the Potter phone").  The entire document was admitted; however, Agent Lott's testimony focused on communication occurring on January 31, 2012, the day of the murders.  The text messages from this period of time are consistent with Jamie's testimony about his communication with the Defendant on the morning of the murders.

The first message sent on January 31, 2012, from the Defendant's email address to Jamie's phone at 1:31 a.m. stated, "I love you, Jamie."  At 2:21 a.m., a text message sent from the Defendant's cell phone to Jamie's cell phone indicated that the Defendant wished to "talk for just a little."  The call history for the phone numbers confirm that after this text message a "[v]ery lengthy" phone call (approximately thirty minutes) occurred between Jamie's cell phone and the Defendant's cell phone.  At 2:30 a.m., a text message was sent from the Defendant's cell phone to Jamie's cell phone stating, "I love you.  I would . . . not take your cell with you [ ]in the morning.  Love."

Agent Lott testified about phone calls between the defendants during the early morning hours of January 31.  He noted an eighteen-minute phone call between Jamie's cell phone and the Defendant's cell phone at 1:47 a.m.  There were also several phone calls between the Potter phone and Jamie's phone.  The phone records show a twenty-two

second telephone call from Jamie's phone to the Potter phone at 4:08 a.m. At 4:25 a.m., a text message was sent from the Defendant's cell phone to Jamie's cell phone asking, "[D]id [Buddy] get the phone[?]" Jamie responded by text, "no." At 4:26 a.m. a text from the Defendant's phone was sent stating, "S**t call back." At 4:26 a.m., there was a sixty-one second phone call from Jamie's cell phone to the Potter phone.

From 4:28 a.m. until 4:40 a.m., a series of text messages were exchanged between the Defendant's cell phone and Jamie's cell phone. Jamie confirmed that Buddy had received Jamie's phone call. A message from the Defendant's cell phone inquired as to whether Buddy was angry. Subsequent text messages from the Defendant's cell phone explained that Buddy was "loud" and had "hit two walls" in their home. Another message from the Defendant's cell phone attributed the level of the noise to the fact that her bedroom shared a wall with the living room. Agent Lott confirmed that the Defendant's room shared a wall with the living room in the Potter residence.

At 4:36 a.m. a message from the Defendant's cell phone notified Jamie that, "Is leaving now the front door open and closed." A message sent from the Defendant's cell phone at 4:38 a.m. read, "Yes hes leaveing now i hear the car i love you baby." At 4:39 a.m., another text message from the Defendant's cell phone stated, "I love you he took off love you." The next message was sent from the Defendant's cell phone at 4:40 a.m. and stated, "I love you. Text me ASAP when you get back." This was the last text message or phone call between the parties for approximately seventeen hours.

Agent Lott testified that at 10:11 p.m. a message from the Defendant's email address was sent to Jamie's cell phone that stated, "(Re; I have been worried about) baby you are ok. And like [Buddy] said come over and talk ok. I love you somuch]." Another text message sent from the Defendant's email address to Jamie's cell phone at 10:11 p.m. stated, "I love you so much baby/ He said you were sick soileft you alone]".

After Buddy and Jamie's arrest on February 7, 2012, the Defendant exchanged a series of text messages with Ms. Clayton, the Defendant's online friend who lived in North Carolina. The Defendant notified Ms. Clayton that Buddy and Jamie were "in jail" and their home computer seized. When Ms. Clayton asked why Buddy and Jamie had been arrested, the Defendant responded, "Because they think they killed [Victim Payne] and [Victim Hayworth]. This has got me and my . . . mom so upset. I think they got Jamie. His cell phone is off and house phone just rings. I don't understand." The Defendant told Ms. Clayton via text message, "I wish I knew what Jamie is thinking. It's bad -- the whole -- the town is being really evil" and asked, "Do you think Jamie still loves me?" Towards the end of the conversation, Jenelle wrote, "I just hope Jamie don't hate me."

Following the State's case-in-chief, the Defendant presented two expert witnesses: Keith Jones and Eric Engum. Keith Jones, an expert in computer forensics, conducted a forensic computer analysis of the "forensic duplication" of the data contained on the Potter computer. He viewed activity from the Potter computer, but he explained that it was "very difficult" to determine the identity of the particular user who generated the activity. He explained that such a determination would require numerous "different data points[,]" which were "a whole list of different things that had to either be known by an individual, or was accessible by an individual." When asked how many data points he would need to tie an individual to a computer's activity, Mr. Jones responded, ". . . I cannot give you a number [] because it varies per case." He continued, "What happens is you start by saying this could be anybody that created this traffic and you collect enough data points to . . . make that population shrink until finally you're down to one individual without a doubt that made that activity."

Mr. Jones noted that he found emails on the Potter's computer that contained account passwords in the body of the email. As such, the accounts were not secure and it was possible that a third party could have "pick[ed] up that password" and thereby had access to the Potter's accounts. Mr. Jones testified that he found malware on the Potters' computer but that he did not analyze the malware because it was "outside the scope of what [he] was asked to do." Mr. Jones agreed that it was "common" to find malware on a computer but that the presence of malware would further complicate discovering the identity of the individual generating activity on the computer. He stated that malware could be used by someone else to control the activity on the computer.

About the testimony and evidence related to IP addresses, Mr. Jones stated that an IP address "could belong to anybody in the world" and could be "assigned to any number of computers." Mr. Jones noted that Century Link, as the Potters' internet service provider, could give investigators "subscriber information" as to "who had this IP address at a particular time[,]" but that an IP address was "not a single computer" and, instead, could be assigned to many different computers. He opined that, even if an IP address were to point to a particular house, there would still be additional work to be done to determine the identity of the user generating activity on the computer.

On cross-examination, Mr. Jones testified that he was not given the original disk of email messages provided to the State by AOL pursuant to a search warrant. He stated that he was only tasked with getting a "general sense of what's on the [Potters'] computer[.]"

Eric S. Engum testified as an expert witness in the field of neuropsychology. Dr. Engum met with the Defendant, on several occasions, in April 2014 for a total of 17.5

hours, to conduct a full psychological and neuropsychological evaluation. Based upon the assessment, Dr. Engum concluded that the Defendant had an intellectual disability. He described an intellectual disability as "subnormal intelligence, somebody who does not process information, retain information." Dr. Engum said that the Defendant was not "fairly independent in her living style" and attributed that, in part, to her delay in acquiring mathematical, reading and spelling skills. He referenced assessments from early education that designated the Defendant as a Special Education student. He also noted the Defendant's multiple physical disabilities including, bilateral hearing loss which impairs the way one acquires and processes information.

Dr. Engum testified that the school system in Pennsylvania indicated that the Defendant's IQ was seventy-seven. Dr. Engum conducted his own IQ testing and the Defendant's result was a seventy-two, "about three levels below the average person." Dr. Engum testified that the scores were "virtually identical" indicating consistent intellectual deficiencies throughout the Defendant's life. Dr. Engum also administered the Peabody Individual Achievement Test and the results indicated that the Defendant was performing at grade level 4.4.

Dr. Engum also reviewed the Defendant's medical records and observed that the Defendant had difficulty managing her own medications. He explained that the Defendant had Type I diabetes, requiring the Defendant to monitor her blood sugars and adhere to a medication regiment. The medical records showed that the Defendant failed to adhere to dietary restriction and was unable to comply with her medications, resulting in diabetic ketoacidosis. The medical records indicated that the Defendant was hospitalized on "two or three occasions" because she "couldn't manage medications." Additionally, the Defendant was attacked, either her tenth or eleventh grade, in high school and suffered a brain injury. Dr. Engum explained that a brain injury "magnifies the effects" of an intellectual disability. Dr. Engum testified that the Defendant had never been employed and had been "unable to drive."

Dr. Engum testified that "the allegation that [the Defendant] is in some way a master mind, or a manipulator, or . . . a planner I think really flies in the face of the facts which go back and say that she's functioning basically like a fourth grader."

After hearing this evidence, the jury convicted the Defendant of two counts of first degree premeditated murder and one count of conspiracy to commit first degree murder. The trial court merged the conspiracy conviction and ordered concurrent life sentences for both murder convictions. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the trial court erred when it failed to grant her request for a change of venire; (2) the evidence is insufficient to support her convictions for premeditated first degree murder and conspiracy to commit premeditated first degree murder; (3) the criminal responsibility statute, Tennessee Code Annotated, section, 39-11-402, is unconstitutionally vague; and (4) the trial court erred when it failed to enjoin the prosecutor from publishing his book about this case until the final adjudication in this case. The State responds that this appeal should be dismissed because the Defendant filed an untimely notice of appeal and that the issues presented do not favor waiver of the deadline. Tenn. R. App. P. 4(a).

The Tennessee Rules of Appellate Procedure require us to determine whether we have jurisdiction in every case on appeal. *See* Tenn. R. App. P. 13(b). In criminal cases, an appeal as of right lies from a final judgment of conviction. Tenn. R. App. P. 3(b). Filing a notice of appeal within thirty days of the final judgment date initiates this appeal; however, this Court has authority to waive "in the interest of justice" the untimely filing of a defendant's notice of appeal. Tenn. R. App. P. 4(a). If a timely motion for new trial under Tennessee Rule of Criminal Procedure 33(b) is filed, however, "the time for appeal . . . shall run from entry of the order denying a new trial . . . ." Tenn. R. App. P. 4(c).

Tennessee Rule of Criminal Procedure 33(b) provides that a party requesting a new trial must file his or her request within thirty days of the entry of the order of the sentence. Tennessee Rule of Appellate Procedure 3(e) provides that, in all cases tried by a jury, a defendant waives any issue relating to an "action committed or occurring during the trial . . . or other ground upon which a new trial is sought" unless the defendant raises such issue in a motion for a new trial. *See State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). Unlike the untimely filing of a notice of appeal, this Court does not have authority to waive the untimely filing of a motion for new trial. *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007); *see* Tenn. R. App. P. 4(a). Also, because this provision is mandatory, the time for filing may not be extended. *See* Tenn. R. Crim. P. 45(b); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). Further, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal; therefore, a late-filed motion for new trial will generally result in an untimely notice of appeal. *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997).

We agree with the State that the Defendant's motion for a new trial was untimely filed. The Defendant's motion for a new trial, filed on August 7, 2015, was filed thirty-one days after the trial court filed its judgment on July 7, 2015, one day late. *See* Tenn. R. Crim. P. 33(b). The trial court considered and ruled on the Defendant's motion for a new trial even though it was untimely. The trial court's jurisdiction to grant the Defendant a new trial, however, expired thirty days after it entered the judgments of conviction. *Martin*, 940 S.W.2d at 569; *Stephens*, 264 S.W.3d at 728. As such, the trial

court had no jurisdiction to hear the Defendant's motion for a new trial, and the order issued denying a new trial was a nullity and "does not validate the motion." *Martin*, 940 S.W.2d at 569.

We conclude that the Defendant, by failing to file a timely motion for a new trial, waived review of her objections to the trial court's denial of the Defendant's request for a change of venire and refusal to enjoin the prosecutor from publishing a book before the final adjudication in the Defendant's case. *See* Tenn. R. App. P. 4(e); *Keel*, 882 S.W.2d at 416. The general rule barring issues not raised in a motion for a new trial from being considered on appeal also applies to an attack upon the constitutional validity of a statute for the first time on appeal, unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion. *Lawrence v. Stanford*, 655 S.W.2d 927, 29 (Tenn. 1983) (*citing, City of Elizabethton v. Carter County*, 321 S.W.2d 822 (1958); *Veach v. State*, 491 S.W.2d 81 (1973); *Harrison v. Schrader*, 569 S.W.2d 822 (1978); *Dorrier v. Dark*, 537 S.W.2d 888, *rehearing* 540 S.W.2d 658 (1976). With regard to the Defendant's claim that the criminal responsibility statute, Tennessee Code Annotated, section 39-11-402 is unconstitutionally vague, we note that this court has previously held the statute is not unconstitutionally vague; therefore, we cannot conclude that the statute is "obviously unconstitutional on its face." *See State v. Justice Ball*, No. W2016-01358-CCA-R3-CD, 2017 WL 2482996 at *8 (Tenn. Crim. App., at Jackson, June 7, 2017), *perm. app. denied* (Tenn. Oct. 5, 2017). The Defendant has waived review of this issue.

Although insufficiency of conviction evidence need not be raised in a motion for new trial in order to secure appellate review, there is no automatic appeal of this issue to this court. *State v. Boxley*, 76 S.W.3d 381, 389 (Tenn. Crim. App. 2001). In order to perfect an appeal, either the Defendant must timely file a notice of appeal, or this court must waive a timely filing of a notice of appeal. *Id*.

The Defendant's notice of appeal, filed on November 25, 2015, was untimely. The thirty-day period specified in Rule 4(a) of the Tennessee Rules of Appellate Procedure for filing a timely notice of appeal began to run on July 7, 2015, when the trial court entered the Defendant's sentencing order, and ended on August 6, 2015. The Defendant's notice of appeal, therefore, was filed beyond the thirty-day period. *See* Tenn. R. App. P. 4(a). Further, the late-filed motion for a new trial did not toll the time for filing the notice of appeal. *Patterson*, 966 S.W.2d at 440.

As stated above, this court has the authority to waive "in the interest of justice" the timely filing of the Defendant's notice of appeal. Tenn. R. App. P. 4(a). The Defendant, despite receiving the State's brief pointing out the Defendant's late filings, has not sought waiver "in the interest of justice" of the timely filing requirement of the notice of appeal.

- 43 -

*See* Tenn. R. App. P. 4(a). The Defendant fails to address the late filing or explain how waiving the timely filing of the notice of appeal serves the "interest of justice." Our independent review of the record, however, reveals that a waiver of the Defendant's late notice of appeal would serve the interest of justice.

## A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the
> jury see the witnesses face to face, hear their testimony and observe their

demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## 1. First degree Premeditated Murder

The Defendant was convicted of first degree premeditated murder under the theory of criminal responsibility. Tennessee Code Annotated, section 39-11-402 provides the following:

A person is criminally responsible for an offense committed by the conduct of another, if:

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or

(3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Criminal responsibility is not a separate crime but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). The legislative

intent in promulgating the theory of criminal responsibility is to "embrace the common law principles governing aiders and abettors and accessories before the fact." *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997). Under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime. *See id*. Mere encouragement of the principal will suffice. *See State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App.1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2014). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *Id*. In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our Supreme Court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence showed that the Defendant had an active presence on social media. She engaged in numerous social media disagreements with the victims and some of the victims' friends. Members of the community knew the Defendant to be an "enemy" of the victims based upon the internet interactions, wherein the Defendant publically wished harm to the victims and their baby.

Many of the derogatory comments were written by "Chris" or "Matt Potter." The State's theory of the case was that the Defendant wrote under these names. The evidence at trial showed that all emails and messages purportedly written by "Chris" originated from the Defendant's email or Facebook account. The Defendant identified "Chris" and "Matt Potter" on Facebook as her "brothers"; however, Christie Groover and the Defendant are Buddy and Barbara's only children. Law enforcement officers were unable to locate any CIA agent named "Chris" working in Johnson County but located a Chris Tjaden, as identified in the Defendant's writing, in Delaware. Mr. Tjaden denied any communication with the Defendant since high school in 2000, and had never worked for the CIA. Additionally, emails and messages written by "Chris" shared similar writing patterns to the Defendant's writing. Based upon this evidence, the jury could reasonably infer that the Defendant was writing as either "Chris" or "Matt Potter" and making numerous statements of the desire and the intent to kill the victims.

The Defendant name-called, issued threats, and alleged illegal activity by the victims. Consistent with the Defendant's online derogatory comments about the victims' baby, the Defendant and Barbara confronted Victim Hayworth, weeks after she had given birth to the baby, at a gas station and told her she did not "deserve" the baby.

The Defendant was at the center of the online controversy involving the victims, and she drew Buddy, Barbara, and Jamie into the controversy by soliciting their aid and protection. Through the use of the fictitious online personality, "Chris," the Defendant incited anger and fear among Jamie, Barbara, and Buddy and encouraged the murders of Victim Payne and Victim Hayworth. The Defendant forwarded to both Jamie and Barbara alleged emails from Ms. Thomas, cursing and threatening the Defendant. The Defendant reported to police that Victim Payne had threatened to kill her and "they" would kill Buddy and Barbara to "get to [her]." Writing as "Chris," the Defendant suggested to Barbara, "I wish I [k]new someone that would kill her while I'm here. But if you want [to] kill her and nothing will be asked for sure. I mean a missing person is a missing person." Through "Chris," the Defendant assured Barbara that Buddy was "in the computer" as an active member of the CIA. Following his arrest, Buddy told Barbara in a phone call that he committed the murders because of the victims' harassment of the Potter family.

Contrary to the Defendant's denial to the police of any romantic relationship with Jamie, the Defendant sent numerous text messages to Jamie expressing her love and devotion. In an email introduced at trial, the Defendant signed her "love letter" to Jamie as "Your wife." The Defendant writing as "Chris" also assured Jamie of the Defendant's devotion and loyalty to him. Based upon his belief that he was part of a relationship and family, Jamie acted in concert with Buddy to protect the Defendant. Writing as "Chris," the Defendant wrote to Jamie that the harassment was "going to kill" the Defendant.

Through "Chris," the Defendant encouraged Jamie to work with Buddy to resolve the harassment, writing "I hope you all can get them. I hope it all works out great. I hope that you will pray about it and Buddy is and that you know what you are all doing is great. (Your going to help the town.) wish i could kill them but right now i really can't."

During the early morning hours of January 31, the Defendant coordinated the communication between Jamie and Buddy as they prepared to go to Paw Bill's house and kill Victim Payne and Victim Hayworth. The Defendant advised Jamie "not to take his cell phone" to Paw Bill's that morning, and she notified him when Buddy had left the Potter house. After the murders, the Defendant exhibited her knowledge of the murders by conveying to Jamie her awareness that after Buddy dropped Jamie off at his home, Jamie had vomited in response to witnessing the murders. The Defendant also communicated to Ms. Clayton her concern that Jamie might be "mad" at her following his arrest.

Based upon this evidence, we conclude that a jury could find beyond a reasonable doubt that the Defendant actively participated in the murders of Victim Payne and Victim Hayworth. The Defendant encouraged both Buddy and Jamie to commit the murders by conveying to them that the victims had harassed and threatened her. The Defendant portrayed herself as the helpless victim of her harassers in soliciting their protection. The Defendant's communication with Jamie leading up to the murders evidence her intent to promote or assist in the commission of the murders of Victim Hayworth and Victim Payne. The Defendant is not entitled to relief.

## 2. Conspiracy to Commit First degree Murder

The indictment charged the Defendant and Barbara with acting in concert with Jamie to murder the victims. The offense of conspiracy is committed if two or more people, each having the culpable mental state required for the offense which is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one or more of them will engage in conduct which constitutes such offense. T.C.A. § 39-12-103(a) (2014). It is also required that "an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." T.C.A. § 39-12-103(d) (2014).

The essential feature of the crime of conspiracy is the accord-the agreement to accomplish a criminal or unlawful act. *See State v. Pike*, 978 S.W.2d 904, 915 (Tenn. 1998); *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989). A formal agreement is not required, nor must it be expressed; it may, and often will, be proven by circumstantial evidence. *See Pike*, 978 S.W.2d at 915; *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim.

- 48 -

App. 1992) ("[A] mutual implied understanding is sufficient, although not manifested by any formal words, or a written agreement"). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

The evidence, in the light most favorable to the State, established that the Defendant was initially friends with Victim Payne but that the relationship quickly soured once Victim Payne began dating Victim Hayworth. The Defendant began posting derogatory comments about both victims online and soon a "war" ensued. The Defendant shared examples of the alleged harassment with Barbara. The Defendant, writing as "Chris," notified Barbara of potential threats to the family, encouraged her to carry a gun, and expressed concern that the Defendant might attempt suicide because of the ongoing harassment. Barbara wrote to "Chris" that she would do whatever she had to do "to save [the Defendant]." She compared herself to a mother lion, writing "I'll do whatever it takes to save my young," and threatened "I will kill." In an email from Barbara to the Defendant about the harassment, Barbara wrote, "I'm here to listen and plan or whatever you need . . . just come to me."

Barbara kept Buddy, who by all accounts did not use the home computer, informed of the details of the harassment and her communication with "Chris." Barbara wrote to "Chris" asking if he had any "plans" and informing him that Buddy "just needs another guy." The Defendant, writing as "Chris," encouraged Barbara to have Buddy meet with Jamie. Barbara responded, confirming that she had spoken with Jamie by phone and providing information about a planned meeting with Jamie. About killing Victim Hayworth, "Chris" assured Barbara that "you can get away with it."

Jamie, who also did not have a Facebook account, learned about the harassment through the Defendant and Barbara. Although initially Barbara did not approve of Jamie, with encouragement from "Chris," she began inviting him to the Potter residence for dinner and emailing with him. In November 2011, Barbara confided in Jamie about the "hurtful, lies" being posted on Topix about the Defendant. Barbara encouraged Jamie to log onto Facebook under a fake profile to access Victim Hayworth's best friend's account. She also informed Jamie about how the victims spoke poorly of Jamie as evidence that he could not trust Victim Payne. She followed up with "Know this. You are Not alone. We are here and we care bout you a lot." Barbara wrote to Jamie that the victims were trying to kill the Defendant "little by little" and expressed hopelessness that, "the cops are behind [the victims] and [Ms.] Thomas per Chris." In December 2011, Jamie wrote to Barbara that the victims "will get whats coming to them." The Defendant, writing as "Chris," also updated Jamie on the ongoing harassment and wrote, "I can't

wait for you and Buddy and us to do our Job's." "Chris" reassured Jamie that he, as a member of the CIA, had Jamie's "back."

On the night of January 30, 2012, hours before the murders, Barbara invited Jamie to the Potter home where Buddy approached Jamie about assisting him with something related to the victims. During the early morning hours of January 31, 2012, the Defendant called Jamie and told him that Buddy wanted his help. The Defendant then coordinated communication between Jamie and Buddy as they prepared to go to Paw Bill's house to kill the victims. The Defendant cautioned Jamie not to take his cell phone with him and notified him of Buddy's departure from the Potter residence. Following the murders, thousands of pages of shredded emails and related documents were found in garbage bags in the back of Buddy's truck. During the search of the Potter residence, Barbara took a stack of documents related to this case and tore them. After Buddy's arrest, he told Barbara that he had participated in the murders and had done so because of the victims' harassment of the Defendant and "to protect Barbara."

The Defendant, Barbara, and Jamie all expressed the desire for the victims to be killed and/or harmed. Together, they worked to coordinate Buddy and Jamie going to Paw Bill's house early on the morning of January 31, 2012, to kill the victims. Accordingly, we conclude that a reasonable jury could find the Defendant conspired with Barbara and Jamie with the purpose of facilitating the murders of the victims. The Defendant is not entitled to relief as to this issue.

### B. Merger of Conspiracy Conviction

The State asserts that the trial court improperly merged the conspiracy conviction and failed to impose a sentence for that conviction. Tennessee Code Annotated, section, 39-12-106(c), provides, "A person may be convicted of conspiracy and the offense which was the object of the conspiracy." The Advisory Comments provide further clarification, "Under subsection (c), the conspiracy is not merged with the completed offense and, therefore, the offender may be convicted of both the conspiracy and the object offense." In *State v. Watson*, this court noted the trial court's error in merging a conviction for conspiracy to commit first degree murder and first degree premeditated murder. 227 S.W.3d 622, 628 (Tenn. Crim. App. 2006). Accordingly, we reinstate the Defendant's conviction for conspiracy to commit first degree murder and remand to the trial court for sentencing on that count.

### III. Conclusion

Based upon the foregoing, we reinstate the Defendant's conviction for conspiracy to commit first degree murder and remand to the trial court for sentencing on that count.

We affirm the trial court's judgments as to the two counts of first degree premediated murder.

_____
ROBERT W. WEDEMEYER, JUDGE